James A. **BOYAJIAN**, Assignee of Triumph Manufacturing Company, Bankrupt

v.

**The UNITED STATES.**

No. 261–60.

United States Court of Claims.

March 20, 1970.

**1232**

David V. Anthony, Washington, D. C., atty. of record, for plaintiff. Sellers, Conner & Cuneo, Washington, D. C., of counsel.

Michael J. Rubin, Washington, D. C., with whom was Asst. Atty. Gen., William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

### PER CURIAM.

This case was referred to Trial Commissioner Saul Richard Gamer with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a) [since September 1, 1969, Rule 134 (h)]. The commissioner has done so in an opinion and report filed on April 30, 1969. Exceptions to the commissioner's opinion, findings and recommended conclusion of law were taken by plaintiff, defendant urged their adoption, and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. The commissioner's discussion of, and refusal to apply, the "total cost" theory of damages is wholly consistent with our recent decision in H. John Homan Co., Inc. v. United States, 418 F.2d 522, 189 Ct.Cl. 500 (1969). In *Homan* there were factors—pointed out in the opinion in that case—calling for use of that theory which are absent here. Since the court agrees with the opinion, findings and recommended conclusion of law of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, plaintiff is not entitled to recover and the petition is dismissed.

## OPINION OF COMMISSIONER

GAMER, Commissioner.

The petition herein sets forth, in six causes of action, various claims arising out of production contracts which the Triumph Manufacturing Company, an Illinois corporation, entered into with the Air Force in 1955 and 1956. Triumph was adjudged a bankrupt in 1958, and in 1960, as authorized by an order of the bankruptcy court, all of its right, title, and interest in the claims herein were assigned to plaintiff, who was Triumph's president and principal stockholder. For convenience, however, Triumph will sometimes be referred to as the plaintiff.

On defendant's motion for summary judgment, the court, by order of October 30, 1964, dismissed the fifth cause of action. Thereafter, trial proceedings were conducted with respect to the remaining five causes.

The causes of action left for consideration are grounded upon contracts for the manufacture of "Modulators,"[1] as well as a contract for the manufacture of "Interval and Dwell Testers."[2] There

---

1. A Modulator is an item of electronic test equipment used at maintenance depots to calibrate radio receiving equipment which is to be used in aircraft. The Modulator reproduces the signals generated by ground transmitters to aircraft in flight. Such signals are given to direct the course on which the plane is to fly.

2. An Interval and Dwell Tester is also an item of test equipment used in the testing of aircraft bomb release interval controls, involving both the foot spacing ("Interval," i. e., the distance measured along the flight path between points of impact of two successive bombs) and time duration ("Dwell," i. e., the percentage of the time the bomb release is

were three Modulator contracts dated October 24, 1955, May 2, 1956, and July 20, 1956, respectively, but they were generally administered as one. (Essentially, the second and third contracts constituted additions to the original quantity.) [3] Accordingly, they will sometimes be referred to collectively as the Modulator contract. The Interval and Dwell Tester contract was dated February 10, 1955.

## THE MODULATOR CONTRACT CLAIMS

### First Cause of Action

The contract provided that preproduction models, referred to as "First Articles," be submitted to defendant for testing and approval prior to the commencement of full-scale production. Plaintiff contends that it manufactured the three required models and, prior to their submission to defendant, it proceeded, as provided by the contract, to test them to make certain they were properly calibrated; that such tests were performed in accordance with a method authorized by the contract, i. e., the "interference pattern method"; that, in applying such test method, plaintiff complied in all respects with the specified procedures; that defendant, however, knew from past experience on previous contracts, but wrongfully failed to disclose to plaintiff, that such procedures were defective and that it would, therefore, be difficult to attain proper calibration with their use; that, upon plaintiff's submission of the models in October 1956, defendant tested them by using a different method, i. e., by employing certain test equipment called a "Zifor"; [4] that the Zifor was a relatively new item, manufactured by the Collins Radio Company, which

quickly gave accurate calibration results; that defendant's Zifor tests showed that the three submitted First Articles were not properly calibrated, resulting in their rejection; that defendant then wrongfully insisted that the First Articles, as well as all 529 Modulators to be produced, be thereafter tested and calibrated only in accordance with the Zifor; that, although defendant lent a Zifor to plaintiff for the limited purpose of properly calibrating the First Articles, which were thereafter accepted on January 31, 1957, plaintiff was required to purchase a Zifor from the Collins Radio Company for use in its contract production operations and that plaintiff could not, therefore, commence such operations until it had obtained a Zifor; and that defendant's insistence upon plaintiff's use of a Zifor caused a six-month delay in the performance of the contract in that plaintiff was not able to obtain one until April 1957 and could, therefore, make no substantial or effective production progress until such time. Plaintiff says that the furnishing by defendant of inaccurate and defective interference pattern method calibration procedures, as well as its knowledge, but failure to make disclosure, of such defective procedures and the resultant difficulties of obtaining accurate results from the use thereof, constituted breaches of the contract. It argues that, had it known in October 1955, when the contract was awarded, that the interference pattern method would be useless, and that defendant would insist on the Zifor procedure instead, it could have then promptly ordered a Zifor and would have had ample time to obtain it prior to the submission of the First Articles a

"on" to the total time between two successive bomb releases).

3. Contract No. AF33(604)12150, dated October 24, 1955, was in the amount of $135,845, and provided for the production of 163 Modulators at the unit price of $815. Contract No. AF33(604)13021, dated May 2, 1956, was in the amount of $110,025, and called for the production of 135 units at the same unit price.

Contract No. AF33(604)14201, dated July 20, 1956, in the amount of $188,265, provided for the production of 231 units, also at the same unit price. All the contracts also provided for the furnishing of spare parts and certain engineering and maintenance data.

4. Acronym for "Zero Indicator For Omni-Range."

year later in October 1956,[5] so that production could have then immediately commenced. Thus, says plaintiff, the six-month delay in production to April 1957, during which period plaintiff's overhead and other expenses continued, would have been avoided. This cause of action is based upon such delay damages.

### Second Cause of Action

Plaintiff contends that the aforesaid six-month delay in production to April 1957 depleted its capital to such an extent that it was unable to continue with performance; that, to enable plaintiff to continue, plaintiff and the Air Force, under date of April 10, 1957, entered into an "Advance Payment Pool Agreement" under which defendant agreed to advance to plaintiff amounts not to exceed $250,000; that defendant, on April 10, 1957, and July 18, 1957, advanced the sums of $160,000 and $20,000, respectively, but despite plaintiff's need for the balance of $70,000 to obtain the smooth production flow incident to large-scale production, defendant arbitrarily and capriciously refused to advance any additional sums; and that defendant's refusal was, under the circumstances, a breach of contract, resulting in inefficient, costly, and delayed contract performance.[6]

### Third Cause of Action

This cause is grounded upon the same facts as the first cause of action. The difference between the two causes relates only to the damages. On the first cause, plaintiff claims only delay damages resulting from the alleged breaches of contract. On this third cause, dam-

ages are based on alleged "additional work, labor and services not contemplated by the contract." Petition, ¶ 14.

### Damages

Plaintiff combines all three causes together for damage purposes. Such damages are equated with the loss it incurred in completing the contract. Plaintiff takes its total claimed contract costs of $694,735, subtracts therefrom its total contract receipts of $486,210, and seeks to recover the difference of $208,525.

Defendant contests plaintiff's right to recover on these causes both on the facts and the law. As to the first and third causes, it particularly relies on its defense of failure to exhaust administrative remedies under the contract Changes and Disputes clauses. Plaintiff did not submit any of its claims to the Armed Services Board of Contract Appeals. Defendant says that the causes of action grounded upon the required use of the Zifor are in effect based only on an alleged change in contract requirements susceptible to appropriate handling under such contract clauses. Defendant concedes, however, that the contract clauses do not provide any administrative remedy with respect to the second cause of action based upon an alleged breach of the Advance Payment Pool Agreement.

Defendant urges further that, in any event, and regardless of the merits of the three causes of action, plaintiff's attempt to obtain recovery on the basis of its total expenditures less contract receipts is, under the facts and circumstances here involved, wholly inappro-

---

5. Plaintiff originally had five months within which to submit the First Articles. The submission in October 1956, a year after the first contract of October 1955, followed duly granted extensions of time to September 15, 1956.

6. The contract provided that five units of every shipment, no matter how small or large the shipment was, would be subject to inspection by inspectors stationed at the plant. Plaintiff contends that de-

fendant's refusal to advance the $70,000 balance necessitated plaintiff's satisfying its current, continuous, needs for cash by constantly making small shipments (instead of shipments in lots of 65, as the contract permitted), the payments for which constituted the only method plaintiff had for generating cash. Plaintiff complains that this caused a continuous disruption of its production line in order to permit numerous inspections.

priate, and that, since the record contains no other proof indicating what, on a proper basis, plaintiff's damages attributable to defendant's alleged breaches were, the three causes of action should be dismissed for failure of damage proof.

■ Defendant's defense based on plaintiff's failure to prove damages is, on this record, required to be sustained. The so-called "total cost" method upon which plaintiff relies is here unacceptable. Accordingly, there is no need to make any determination on the merits of these three causes, for even assuming they are valid and that defendant's conduct amounted to the claimed breaches, plaintiff's failure to make any satisfactory showing of the amount of damages flowing from such breaches would require the dismissal of such causes anyway.[7]

■ Recovery of damages for a breach of contract is not allowed unless acceptable evidence demonstrates that the damages claimed resulted from and were caused by the breach. "The costs must be tied in to fault on defendant's part." River Construction Corp. v. United States, 159 Ct.Cl. 254, 270 (1962). As the court held in J. D. Hedin Construction Co. v. United States, 347 F.2d 235, 259, 171 Ct.Cl. 70, 108 (1965):

> As in all breach of contract cases, the proper measure of damages for defendant's breaches is the amount of plaintiff's extra costs directly attributable to said breaches. Saddler v. United States, *supra*. [287 F.2d 411, 152 Ct.Cl. 557 (1961)] These take the form of delay damages compensated as increased overhead incurred as a result of the protracted performance. Moreover, the contractor is entitled to recover its additional expenditures directly attributable to the breach. In computing the additional overhead, we have held that a contrac-

tor is entitled to recover as damages the amount of overhead on a daily basis allocable to the period of overrun for which the government is responsible. F. H. McGraw & Company v. United States, 130 F.Supp. 394, 131 Ct.Cl. 501 (1955); Fred R. Comb Co. v. United States, 103 Ct.Cl. 174 (1945).

Defendant properly contends that the excess costs claimed must be tied in to defendant's breaches. * * *

However, contrary to these basic causal-connection damage principles, no attempt is here made to relate any specific amount of increased costs to any particular alleged breach. Nor is any satisfactory explanation given as to why such an attempt was not made or why it would not have produced reasonably accurate results. Instead, the damage proof consists only of an accountant's schedule (and the accountant's testimony in support thereof), setting forth computations, based on plaintiff's books and records, of plaintiff's total expenditures in performing the contract, and subtracting therefrom the total contract receipts, thus arriving at a total "loss" figure, for which plaintiff demands recoupment. The first cause of action is based solely on a defined, limited delay period resulting from the requirement that a Zifor be obtained. As was pointed out in J. D. Hedin Construction Co. v. United States, *supra*, the ascertainment of increased costs directly attributable to delay resulting from a breach of contract by defendant is normally measurable with a reasonable degree of accuracy. The records in a very large number of cases before this court, which have been deemed sufficient to support judgments for such delay damages (including alleged labor inefficiency and indirect overhead expenses, which plaintiff claims resulted from the alleged delays here involved),[8] attest to

---

7. If plaintiff's "breach" analysis on the first and third causes is erroneous and if instead, as defendant argues, administrative remedies were available, plaintiff's

failure to pursue such remedies would require the dismissal of such causes in any event.

8. Pltf. Brief, p. 14.

this fact. The second cause of action is similarly based on delays.[9] And the third cause of action is grounded on the necessity "to perform additional work, labor and services," again because of the need to obtain a Zifor. Surely, a reasonable attempt could have been made to show how much more work, labor and services had to be performed because of the necessity of obtaining a Zifor.

On this record, it is not possible to conclude that plaintiff's total contract loss, *i. e.*, the difference between plaintiff's contract expenditures and its contract receipts, is reasonably to be equated with the increased costs directly resulting from defendant's alleged breaches.

The first of the three contracts herein was entered into on October 24, 1955. The First Articles were not submitted to defendant until October 15, 1956, almost one year later. The rejection of the First Articles, which is the basis of the first breach claimed, thus did not take place until after their submission on October 15, 1956. However, no Government-caused delay of any kind is alleged during this one-year period which might have in any way affected plaintiff's costs. Although plaintiff shows no contract costs incurred in 1955, substantial expenditures were made in 1956, and, while such 1956 costs are not segregated on a pre-October or post-October basis, it is evident that significant costs were incurred up to October 15, 1956.

This 1956 period, which involves most of the year, covers the time when the setup for the planned large-scale production was being established, when at least some materials were being purchased, and when the work on the First Articles was being accomplished. Yet, plaintiff seeks full reimbursement for all of its labor, material, and overhead costs for the entire year 1956, *i. e.*, to the extent that they were not covered by contract receipts and contributed to its contract loss.[10] Thus, defendant would be called upon to indemnify plaintiff against any price and cost increases which contributed to plaintiff's loss, even though such increases occurred during nondelay periods and for which defendant could in no wise be held responsible. It is settled, however, that a contractor is not entitled to recover "expenses which would properly have been incurred regardless of the [breach]." Saddler v. United States, 287 F.2d 41, 415, 152 Ct. Cl. 557, 564 (1961). And even accepting, under their broadest aspects, the contentions made by plaintiff as to the various alleged delay periods, it is plain that there were, in addition, other nondelay periods during the entire time of contract performance, which time extended into 1958 (the last shipment having been made on April 17, 1958). The alleged six-month delay due to the necessity of obtaining a Zifor is conceded to have terminated in April 1957, when plaintiff was finally able to obtain one.[11] At

---

9. In a letter dated August 27, 1958, written to defendant in support of an application plaintiff had made on March 18, 1958, for relief under Title II of the First War Powers Act of 1941, in which plaintiff sought to recover its loss in the amount of $223,000 under the three Modulator contracts, plaintiff stated that " * * * the failure of the government to make the further advance payments agreed upon, delayed production under the contracts some additional seven months * * *." The first request for further funds which plaintiff specified it made and which was denied was on August 16, 1957.

10. For the full year 1956, plaintiff expended $12,928 for "Direct Labor," $12,390 for "Engineering Labor," $25,463 for "Manufacturing Overhead," and $15,390 for "General and Administrative Expenses," the four items totaling $66,171. Material costs for 1956, 1957, and 1958 totaled $316,324.

11. Plaintiff makes no allowance for a reasonable testing period by defendant even had the First Articles originally been calibrated by plaintiff by the Zifor method. In the aforesaid application of March 18, 1958, which plaintiff made for relief under Title II of the First War Powers Act of 1941 for its loss under the three Modulator contracts, it stated that it

the same time, the Advance Payment Pool Agreement was executed and $160,000 advanced thereunder, giving plaintiff the funds without which it was unable to proceed with contract performance.[12] This new financing, plus the acquisition of the Zifor, admittedly enabled plaintiff to proceed with its production activities. It was not until some three months later, *i. e.*, sometime after July 18, 1957, when defendant made its $20,000 advance under the Advance Payment Pool Agreement, that plaintiff began complaining that its production activities were being hampered because defendant would not advance any further part of the $70,000 still available under the agreement. Thus, even were plaintiff's delay contentions accepted, there would be an additional nondelay period between April 17, 1957, and the time later in the year when the alleged delays attributable to defendant's refusal to make any further advances under the agreement occurred.[13] Yet, by the "total cost" method here urged, plaintiff makes no distinction between the delay and nondelay periods. All contract expenditures throughout the entire contract period of performance are indiscriminately lumped, and insofar as contract receipts failed to cover them, reimbursement is asked in full. It is noted, however, that when, on March 12, 1958, plaintiff sought an equitable adjustment because it "was required to acquire Zifor test equipment and resubmit first articles and was subjected to a four months delay and additional engineering and labor costs on account of this change in specifications," it evidently did arrive at what it felt was an approximate specific sum for this particular matter since it stated: "This change and resulting delays on these contracts involved additional costs to the contractor in the amount of $25,000." [14]

Furthermore, if plaintiff proceeded on the basis of definite delay periods, and increased costs directly attributable thereto, it would of necessity be obliged to take into account the fact that productive work was actually proceeding during such periods. The "delay" periods complained about were in no way marked by complete inactivity. By plaintiff's own admission, its forces were performing at least some work on the making of subassesmblies while awaiting the Zifor.[15]

"was subjected to a four months delay" because it was "required to acquire Zifor test equipment." A similar application plaintiff had filed on February 26, 1957, also was based on a four-month delay (such period apparently being attributable, however, to the period from the date the First Articles were submitted in October 1956 to the date they were approved in January 1957). Similarly, plaintiff's request of March 12, 1958, for an equitable adjustment based on the Zifor requirement also claimed only a four-month delay.

12. Plaintiff testified that by April 17, 1957, when the Advance Payment Pool Agreement was executed, its capital had been depleted as a result of the six-month delay because its overhead continued; it was necessary to maintain its labor force; and contract supplies and materials had to be paid for. However, in its application of March 18, 1958, for relief under the First War Powers Act, plaintiff stated that in April 1957 it had available $190,000 under a V-loan from the First National Bank of Chicago, which loan was guaranteed by the Air Force, in addition to the funds made available under the Advance Payment Pool Agreement.

13. As noted (n. 9), in plaintiff's letter of August 27, 1958, in support of its First War Powers Act application for relief, it specified August 16, 1957 as the date of its first request for further funds which was denied.

14. The request for the equitable adjustment contains no breakdown or other computation as to the basis for the $25,000 figure. However, in a letter written on April 22, 1957, in support of a claim it had submitted for relief under the First War Powers Act, plaintiff claimed that "as a result of these changes [in the testing procedure]," it had suffered a loss of $128,423. Again no breakdown of this figure is set forth.

15. Record, vol. 1, at 43.

In this connection, it should be noted that, should complete reimbursement be made to plaintiff of all of its contract costs, such costs would include, presumably, all of the interest it paid on a V-loan which it had (granted on September 7, 1956, in the amount of $140,000, and increased to $190,000 on January 25, 1957), insofar as such loan proceeds were used in connection with the Modulator contracts (the loan could be used for any defense contract work plaintiff had), as well as the interest it paid on the $180,000 in advances it had received under the Advance Payment Pool Agreement. Thus, plaintiff, in connection with the performance of the contracts, would receive interest-free Government financing.[16] Similarly, it would include reimbursement to plaintiff of an expenditure for one thousand handbooks, the justification for which plaintiff itself could not explain, since the contract requirement with respect thereto had been canceled.[17]

Nor does plaintiff make any satisfactory showing that its losses were not at least in part attributable to an unduly low unit price. On the first contract, plaintiff originally bid $880 per unit, but, as a result of negotiation, lowered the unit price to $815. On the two subsequent awards, plaintiff maintained its $815 unit price, although no other bidder would come down to that level.

Finally, the record further shows production interruptions and delays caused by events in no way attributable to defendant but for which plaintiff makes no adjustments whatsoever. For instance, Eastern Air Devices, Inc., plaintiff's important subcontractor for the necessary motors, required, because of its own production scheduling needs, substantial "lead time," and this caused an initial delay of around three months

in plaintiff's production when plaintiff, after finally having obtained the Zifor and the necessary financing under the Advance Payment Pool Agreement, was prepared to embark on full-scale production. At the trial plaintiff conceded that defendant was not responsible for this particular delay caused by Eastern.[18] The same delay would have occurred had the First Articles been approved in October 1956.[19] Similarly, it was, as set forth in plaintiff's own formal request, "delays in deliveries of packaging materials," as well as "a machinery breakdown at the company manufacturing the aluminum extrusions for the transit cases," which necessitated its second advance of $20,000 under the Advance Payment Pool Agreement.[20] Also, although the First Articles were originally due to be submitted on June 9, 1956, they were, pursuant to extensions of time requested by plaintiff, not submitted until October 1956.[21]

In situations similar to the instant one, the court has consistently rejected damage claims based on the theory that all unreimbursed contract expenditures of every nature made throughout the life of the contract should be reimbursed. Urban Plumbing & Heating Co. v. United States, 408 F.2d 382, 187 Ct.Cl. 15 (1969), petition for cert. filed July 25, 1969; Phillips Construction Co. v. United States, 394 F.2d 834, 184 Ct.Cl. 249 (1968); WRB Corp. v. United States, 183 Ct.Cl. 409 (1968); Turnbull, Inc. v. United States, 389 F.2d 1007, 180 Ct.Cl. 1010 (1967); Roberts v. United States, 357 F.2d 938, 174 Ct.Cl. 940 (1966); Wunderlich Contracting Co. et al. v. United States, 351 F.2d 956, 173 Ct.Cl. 180 (1965); Laburnum Construction Corp. v. United States, 325 F.2d 451, 163 Ct.Cl. 339 (1963); River Construction Corp. v. United States, *supra*;

16. As of August 4, 1958, *i. e.*, after plaintiff was put into involuntary bankruptcy, the unpaid balance of the V-loan was over $160,000.

17. Record, vol. 4, at 589–92.

18. Record, vol. 1, at 108.

19. Record, vol. 2, at 163–64.

20. Plaintiff's letter of July 3, 1957, to defendant.

21. Prior to the final extension, consideration was given to a default termination because of plaintiff's delinquency in the submission of these Articles.

Snyder-Lynch Motors, Inc. v. United States, 292 F.2d 907, 910, 154 Ct.Cl. 476, 480 (1961); Lilley-Ames Co., Inc. v. United States, 293 F.2d 630, 164 Ct.Cl. 544 (1961); F. H. McGraw & Co. v. United States, 130 F.Supp. 394, 131 Ct. Cl. 501 (1955); Christensen Construction Co. v. United States, 72 Ct.Cl. 500, 514 (1931).

In Christensen Construction Co. v. United States, *supra* at 514, the court, noting that "the amount of [the claimed] recovery is based upon the alleged total expenditures of the entire work less the amount received from the Government," held that "[t]his is not the proper basis for recovery. To include all costs to plaintiff on the project, proper and improper, would place upon the Government the necessity of reimbursing it for whatever losses it incurred, notwithstanding their nature." In Laburnum Construction Corp. v. United States, *supra*, 325 F.2d at 458–459, 163 Ct.Cl. at 351–352, the court, after rejecting a calculation of "plaintiff's damages by deducting from its overall direct costs the contract price that had been paid for it," held that "[t]he proper measure of damages in a case such as this [*i. e.*, various alleged delays caused by the Government] is to permit the plaintiff to recover its costs during the periods of delay," and that "[t]he burden of allocating costs to the particular periods involved is upon the plaintiff." In Lilley-Ames Co., Inc. v. United States, *supra*, 293 F.2d at 632, 154 Ct.Cl. at 549, the court held that "[t]he plaintiff of course can recover only for those expenses occasioned from the [breach] by the defendant. The plaintiff may not include all costs arising from the performance of the contract as the basis for its recovery." And in Turnbull, Inc. et al. v. United States, *supra*, 389 F.2d at 1015, 180 Ct.Cl. at 1025, the court, noting the contractor's failure "to prove increased costs or damages relating to specific or separate items," refused to measure the amount of an equitable adjustment based upon "the difference between its bid price and the actual cost of performing

the entire contract." It reiterated its past criticism of "this 'total cost' method of computing recovery" as being unsatisfactory.

In the instant case, the proof of "damages" in effect consisted only of a schedule, supported by an accountant's testimony, indicating what plaintiff's books and records showed were plaintiff's total contract costs, the total contract receipts, and plaintiff's total loss, being the difference between the costs and the receipts. That this is not in and of itself acceptable "proof," was made plain in River Construction Corp. v. United States, *supra*, 159 Ct.Cl. at 270–271, where the court held: "Recoverable damages cannot be proved by a naked claim for a return of costs even where they are verified. The costs must be tied in to fault on defendant's part. Plaintiff's claim is something like an attempt to secure damages based on the difference between costs and the contract price or a bid price. Such a method was rejected by the court in F. H. McGraw & Co. v. United States, 130 F.Supp. 394, 131 Ct.Cl. 501, 511  *  *  *. A schedule of verified costs  *  *  * is not proof of damages but only a starting point  *  *  *. Such a schedule verified by defendant is not an admission of anything but the accuracy of the statement reflecting the contents of books and records examined and the allocations and computations based thereon. Plaintiff's one witness who testified about costs only verified that they were incurred on the job  *  *  *. That did not prove defendant's responsibility for those costs nor their reasonableness." And in Roberts v. United States, *supra*, 357 F.2d at 944–945, 174 Ct.Cl. at 949, the court again noted " *  *  *  their [plaintiff's costs] appearance on plaintiff's damage schedule does not by itself amount to probative evidence in the absence of anything else  *  *  *.  *  *  *  [P]roof that the plaintiff's costs  *  *  * exceeded his payments under the contract would not in the usual case give rise to his right to recover the difference."

It is true, as plaintiff points out, that a calculation of a contractor's total expenditure in the performance of his contract has been used in a few cases as the basis for a determination of his damages or increased costs resulting from some act of the defendant. However, an examination of each such case in this court demonstrates that in none of them did the damage proof relied on consist, as it does here, only of a single subtraction of contract receipts from total expenditures. In all of them, the total cost computation was used as "only a starting point" (River Construction Corp. v. United States, *supra*, 159 Ct.Cl. at 271), with such adjustments thereafter made in such computation as allowances for various factors as to convince the court that the ultimate, reduced, figure fairly represented the increased costs the contractor directly suffered from the particular action of defendant which was the subject of the complaint. Similarly, in none of them were separate alleged breaches of contract combined for damage purposes into one "total loss" figure, with no attempt made to segregate the increased costs flowing directly from each breach.

Great Lakes Dredge & Dock Co. v. United States, 96 F.Supp. 923, 119 Ct.Cl. 504 (1951), cert. denied, 342 U.S. 953, 72 S.Ct. 624, 96 L.Ed. 708 (1952), involved an equitable adjustment to which the court held the contractor to be entitled as a result of a changed condition. The contract provided, in accordance with the usual standard clause, that such an adjustment should be based upon an "increase or decrease of cost." In such cases the starting point for the calculation of the amount of the equitable adjustment is invariably a computation of the contractor's cost of performing the extra work ordered by a change order or resulting from a changed condition. See Bruce Construction Corp. et al. v. United States, 324 F.2d 516, 163 Ct.Cl. 97 (1963). In *Great Lakes Dredge*, the court rejected the contracting officer's equitable adjustment allowance which was based not on the contractor's actual increased costs but on what the costs would have been had a different system of coping with the changed condition been used. Instead, the court based the equitable adjustment on the difference between the contractor's actual and originally estimated costs after making, however, an adjustment for the contractor's underestimated bid, as well as adjustments for other costs, as shown by the record, for which the contractor was responsible and which were not attributable to the changed condition. On the record, the court concluded that the resulting amount was "the fairest basis for determining plaintiff's increased costs due to the encountering of this subterranean water * * *." 96 F.Supp. at 926, 119 Ct.Cl. at 559.

MacDougald Construction Co. v. United States, 122 Ct.Cl. 210 (1952), also involved an equitable adjustment type of reimbursement resulting from plans and specifications changes. Here, too, the court refused to equate the recovery with the contractor's "total loss" or "total cost." Instead, it again adjusted such "loss" and "cost" by making allowances, in amounts shown by the record, for the contractor's underbid and for costs incurred due to reasons other than the Government's action which led to the increased expenditures.

In F. H. McGraw & Co. v. United States, *supra*, decided shortly after *Great Lakes Dredge* and *MacDougald Construction Co.*, the court, in rejecting the proffered "total cost" damage proof, pointed out that what was involved in *Great Lakes Dredge* was a contract clause providing that "if unforeseen conditions were encountered, 'any increase or decrease in cost' should be adjusted." 130 F.Supp. at 400, 131 Ct.Cl. at 511. The court, after stating that "[t]his [total cost] method of proving damage is by no means satisfactory, because, among other things, it assumes plaintiff's costs were reasonable and that plaintiff was not responsible for any increases in cost, and because it assumes plaintiff's bid was accurately computed, which is not always the case, by any

means" (*id.*), flatly stated that its opinion in *Great Lakes Dredge* "was not intended to give approval to this method of proving damage, except in an extreme case and under proper safeguards," and that "[a]pproval was not given to proof of damages for breach of contract by showing the difference in plaintiff's bid and his costs on the entire job."

It is true we were forced in that case by the lack of other proof to compute the increased cost resulting from the unforeseen conditions encountered by taking plaintiff's actual costs incurred on account thereof and deducting therefrom certain costs for which plaintiff was responsible and then deducting from the balance the average of all bids and the defendant's estimate of the cost of the work. But by so doing we did not intend to give approval to proof of damages by showing difference of cost and bid on the entire job. [*Id.*]

And the court considered *MacDougald* to be in the same category as *Great Lakes Dredge*, stating: "In the *MacDougald* case substantially the same thing was done [as in *Great Lakes Dredge*]." *Id.* In *McGraw*, the court, as to the equitable adjustment phase of the case, accepted the contracting officer's finding of the amount of such adjustment (after pointing out that in *Great Lakes Dredge* the contracting officer had failed to make such a finding). And as to the damages for delay, the court, on the basis of "proof of these damages more reliable than the difference in plaintiff's estimate and its actual costs" (130 F.Supp. at 400, 131 Ct.Cl. at 512), reimbursed plaintiff for its overhead allocable to the specific delay period involved (48 days), which the record satisfactorily showed.

Oliver-Finnie Co. v. United States, 279 F.2d 498, 150 Ct.Cl. 189 (1960), is another case that has been cited[22] as having permitted the use of the "total cost" method of computing damages. In that case one component of the breach of contract damages allowed as flowing from an unjustifiable stop-order was increased direct assembly-line labor costs. The proof satisfied the court that under the particular circumstances an accurate determination of such increased labor costs could not be made. It was determined, however, that a reasonably accurate method of measuring this one component of the damages was to calculate the excess of plaintiff's actual direct assembly-line labor costs over its original estimate thereof (the record satisfying the court that plaintiff's estimate on the item was not too low and that its costs with respect thereto were not unreasonable). Although the court, after eliminating one item of direct labor cost (premium pay for a certain class) which it concluded was not attributable to the breach, felt that in this instance the damage amount for the item in question was, as so computed, fair and reasonable, it nevertheless went on to say that "we view basing damages on the difference between bid estimate and actual costs with trepidation" (279 F.2d at 506, 150 Ct.Cl. at 201), and reiterated its *F. H. McGraw & Co.* conclusion that such "method of proving damages * * * is by no means satisfactory * * *." 279 F.2d at 505–506, 150 Ct.Cl. at 200. All other items of damage were, however, specifically calculated and definitely shown to be attributable to the breach, including delay damages related to a specific number of days. Plainly, the court's action on the one direct labor item which was tied into the one stop-order breach involved in the case cannot be considered as authority for the propriety of combining, as plaintiff does here, alleged breaches and, without in any way attempting to relate any specific damage items to any particular breach, simply claiming the excess of the entire amount spent in performing the contract over the total contract amount received.

22. See Phillips Construction Co. v. United States, 394 F.2d 834, 841, 184 Ct.Cl. 249, 260 (1968). Also see Rubin, The Total Cost Method of Computing An Equitable Adjustment, 26 Fed.B.J. 303, 307 (1966).

Finally, J. D. Hedin Construction Co. v. United States, *supra*, upon which plaintiff particularly relies, involved reimbursement for additional foundation work performed as a result of a change in specifications concerning the piles to be used. Thus, the amount claimed for the particular work in controversy was, as the court recognized, "in the form of an equitable adjustment resulting from the change in specifications * * *." 347 F.2d at 246, 171 Ct.Cl. at 86. For the delays involved, the contractor sought only its overhead, and for the increased foundation work costs resulting from the change in the piles specification, which was the work involved in the "total cost" method dispute, plaintiff sought reimbursement for such expenditures as re-excavation for sloughed-in footings, additional backfill, additional form work and grading, additional labor costs and water pumping. The amount allowed for the excess costs involved was specifically found to be "reasonable under the circumstances" (*id.*), and the "total cost" method of determining them the "only possible method by which these damages can be computed * * *." 347 F.2d at 247, 171 Ct.Cl. at 87. On another item of claim, however (loss incurred by reason of having to take over a subcontract), where it was the Government which pressed for the adoption of the "total cost" method because the amount produced thereby happened in this instance to be to its advantage, the court refused to adopt the method "since the exact amount of excess costs which plaintiff incurred as a result of defendant's breach can be precisely computed." 347 F.2d at 257, 171 Ct.Cl. at 105.

Analysis thus indicates that in each of the four above cases, the "total cost" computation was regarded as "only a starting point." River Construction Corp. v. United States, *supra*, 159 Ct.Cl. at 271. In each, the recovery based on total cost was refined by appropriate adjustments. Thus the court used the "method under proper safeguards." J. D. Hedin Construction Co. v. United States, *supra*, 347 F.2d at 247, 171 Ct.Cl.

at 86. Furthermore, the method was used only when the record showed "no other method was available" and "there is no other alternative." *Id.* And, as shown, in three of the four cases (*Great Lakes Dredge, MacDougald,* and *Hedin*), the computation involved reimbursement in the nature of an equitable adjustment, with the fourth (*Oliver-Finnie*) involving only a labor computation which constituted but one component of the damages. It was not, in the usual "total cost" sense, based upon total contract expenditures.

None of such cases were comparable to the instant one, in which several breaches are alleged but consolidated for damage purposes into a claimed unadjusted "total cost" recovery. The above review indicates that the court has never allowed such a recovery in such a case. On the other hand, it has consistently insisted on a showing that "the excess costs claimed must be tied in to defendant's breaches" (*J. D. Hedin Construction Co., supra,* 347 F.2d at 259, 171 Ct.Cl. at 108), especially where, as here, there is an insufficient showing that such a direct damage calculation could not as a practical matter be made.

■ Nor does the mere fact that plaintiff's books and records do not, in segregated form, show the amounts of the increased costs attributable to the breaches give it automatic license to use the "total cost" method. Contractors rarely keep their books in such fashion. Such failure, however, normally does not prevent the submission of reasonably satisfactory proof of increased costs incurred during certain contract periods or flowing from certain events based, for instance, on acceptable cost allocation principles or on expert testimony. See Turnbull, Inc. et al. v. United States, *supra,* 389 F.2d at 1014–1015, 180 Ct.Cl. at 1024–1025.

Finally, plaintiff says that although in the past one of the principal grounds for criticizing the "total cost" method has been that, as stated in F. H. McGraw & Co. v. United States, *supra,* 130 F.Supp. at 400, 131 Ct.Cl. at 511, "it as-

sumes plaintiff's costs were reasonable * * * which is not always the case, by any means," nevertheless this court, in Bruce Construction Corp. et al. v. United States, *supra*, recently adopted a different view, *i. e.*, that a contractor's expenditures made in the performance of the contract would be presumed to be reasonable. However, the issue in *Bruce* in no way involved the application of the "total cost" method of proving damages in a breach of contract case. *Bruce* involved the question of the appropriate amount of an equitable adjustment. There, the contractor was required to substitute a different building block for the block originally specified. Although the contractor actually paid the same price for the different block as it would have paid for the originally specified block, it nevertheless claimed the substituted block had a greater fair market value and that it was entitled to an equitable adjustment which reflected such value. The court rejected the contention, holding that the purpose of an equitable adjustment "is to safeguard the contractor against increased costs engendered by the modification" and that the amount thereof, therefore, "cannot be the value received by the Government * * *." *Id.*, 324 F.2d at 518, 163 Ct.Cl. at 100. It therefore held that the equitable adjustment should be "based on cost and not on fair market value" (*id.*, 324 F.2d at 518, 163 Ct.Cl. at 100–101), provided that such cost is reasonable. And in this connection, the court held that where the contractor itself, as in that case, was claiming that the price it had paid was not "reasonable", in the sense that it was below fair market value, so that "there is an alleged disparity between 'historical' and 'reasonable' costs, the historical costs are presumed reasonable," and "the burden would then be upon claimant to overcome the presumption of reasonableness." *Id.*, 324 F.2d at 519, 163 Ct.Cl. at 101–102.

That the court does not construe such a "historical cost" presumption of reasonableness in an equitable adjustment situation, such as was involved in *Bruce*

where the contractor was itself attempting to reject the reasonableness of its own costs, as carrying over in full force to a "total cost" damage contention is made evident by the cases of WRB Corp., et al. v. United States, *supra*; Turnbull, Inc. et al. v. United States, *supra*; Phillips Construction Co. v. United States, *supra*; Urban Plumbing & Heating Co. v. United States, *supra*; and Wunderlich Contracting Co. et al. v. United States, *supra*, all decided subsequent to *Bruce*, all rejecting the "total cost" method, and all reiterating or quoting with approval said of-cited statement from *F. H. McGraw & Co.*, *supra*, which plaintiff argues was superseded by *Bruce*. For instance, in *WRB Corp.*, the court stated: "This theory has never been favored by the court and has been tolerated only when no other mode was available and *when the reliability of the supporting evidence was fully substantiated*. [Citations omitted.] The acceptability of the method hinges on proof that (1) the nature of the particular losses make it impossible or highly impracticable to determine them with a reasonable degree of accuracy; (2) the plaintiff's bid or estimate was realistic; (3) *its actual costs were reasonable*; and (4) it was not responsible for the added expenses." And the court went on to state that it was not satisfied *"that plaintiff sufficiently proved the reasonableness of its estimates or its actual costs."* [Emphasis supplied.] 183 Ct.Cl. at 426. Thus, the court made clear that in such a case, the contractor's obligation of carrying its burden of submitting satisfactory proof of damage also includes the burden of submitting "fully substantiated * * * supporting evidence" that "its actual costs were reasonable." *Id.* Consequently, it is clear that a contractor does not meet such burden by simply proving what its total expenditures were, and then resting on a presumption of reasonableness as was applied by the court in the quite peculiar equitable adjustment circumstances involved in the *Bruce Construction Corp.* case.

In situations where the court has rejected the "total cost" method of proving damages, but where the record nevertheless contains reasonably satisfactory evidence of what the damages are, computed on an acceptable basis, the court has adopted such other evidence, Christensen Construction Co. v. United States, *supra*; Lilley-Ames Co., Inc. v. United States, *supra*; F. H. McGraw & Co. v. United States, *supra*; Turnbull, Inc. et al. v. United States, *supra*; or where such other evidence, although not satisfactory in and of itself upon which to base a judgment, has nevertheless been considered at least sufficient upon which to predicate a "jury verdict" award, it has rendered a judgment based on such a verdict. WRB Corp., et al. v. United States, *supra*, 183 Ct.Cl. at 425–426. *Cf.* Phillips Construction Co. v. United States, *supra*, 394 F.2d at 842, 184 Ct.Cl. at 263. However, where the record is blank with respect to any such other alternative evidence, the court has been obliged to dismiss the claim for failure of damage proof, regardless of the merits. Roberts v. United States, *supra*, 357 F.2d at 943–944, 174 Ct.Cl. at 946, 949; Snyder-Lynch Motors, Inc. v. United States, *supra*, 292 F.2d at 910, 154 Ct.Cl. at 480; Wunderlich Contracting Co. et al. v. United States, *supra*, 351 F.2d at 964–965, 173 Ct.Cl. at 192–193. *Cf.* River Construction Corp. v. United States, *supra*, 159 Ct.Cl. at 259. The instant case falls in the latter category. Accordingly, plaintiff's three causes of action based upon the Modulator contract must be dismissed.

### THE INTERVAL AND DWELL TESTER CONTRACT CLAIMS

*Fourth Cause of Action*

Paragraph (a) of Part II of the contract Schedule, which part was headed "First Article Inspection," required that, as a "First Article," one tester "shall be tested to determine compliance with the applicable specifications"; that "[a]ll testing of the First Article shall be performed at the Contractor's or at a commercial testing laboratory"; that the " 'test set up' to be used in First Article testing, including wiring diagram, shall be submitted to the Project Engineer before the First Article is tested"; that the tests be witnessed by an Air Force inspector; that the contractor should prepare the test results in report form and submit them to defendant "for evaluation and approval"; and that after satisfactory completion of the tests and the submission of the test data, "the said First Article shall then be forwarded" to defendant "for engineering evaluation and approval."

Paragraphs (d) and (f) of such part further provided, respectively, that "[p]ending approval of the said First Article, the remaining articles of the said item shall not be fabricated, produced, or shipped," and that "[a]t least fifteen (15) days prior to the start of testing of the First Article the Contractor shall send written notification thereof together with a test schedule" to defendant.

Furthermore, the contract specifications, denominated "Exhibit No. WCL–625," contained a Section 4 which was headed "Sampling, Inspection, and Test Procedures," and which classified the inspection and testing of the testers into "preproduction tests" and "inspection tests." [23] Paragraph 4.3 was addressed to the preproduction tests and Paragraph 4.4 to the inspection tests. Paragraph 4.4.3, headed "Contractor's Responsibility," although set forth under the section relating to the inspection tests, nevertheless contained the broad

---

**23.** Paragraph 4.1.1, headed "Preproduction Tests," provided that such tests would be accomplished "to determine that the production equipment meets the requirements of this exhibit." Paragraph 4.1.2, headed "Inspection Tests," provided that such tests would be accomplished "to determine that they [the testers] are equivalent in performance and construction to the approved preproduction sample." Paragraph (f) of Part I of the Schedule provided that such a sample would be lent by defendant to the contractor as a guide to assist in the fabrication of the testers.

provision that "[c]ontractors not having laboratory testing facilities satisfactory to the Government shall engage the services of a commercial testing laboratory capable of conducting tests *to determine compliance with all the requirements and tests in the exhibit,* and acceptable to the Government." [Emphasis supplied.]

Initially plaintiff disregarded all these provisions requiring it to make the preproduction test. It simply produced a tester and, in May 1955, submitted it to defendant without making such test. Its justification for so proceeding was that Paragraph 4.3.1 of the aforesaid specification section relating to the "preproduction test," provided that: "One tester as specified in the contract will be tested for design approval at the Procuring Agency's Laboratory by the agency." [24] Plaintiff interpreted this paragraph as providing that the preproduction test was to be performed by defendant.

However, defendant refused to accept the First Article without the conduct by plaintiff or a commercial testing laboratory engaged by plaintiff of the tests specified in the above-mentioned portions of the contract and specifications and without the prior submission by plaintiff of its proposed test procedure. Plaintiff's reliance on Paragraph 4.3.1 of the specifications in support of its contention that it was the Government and not plaintiff which was required to perform the preproduction test was rejected. Accordingly, plaintiff submitted its proposed test procedure on June 6, 1955, which defendant approved on June 20, 1955, and plaintiff then conducted the test in its own plant. On August 4, 1955, plaintiff again submitted the First Article to defendant, together with the test results. Plaintiff then proceeded to manufacture the 116 testers called for by the contract, holding them in its plant, however, until it received advice from defendant of acceptance of the First Article.

Defendant then submitted the Article to an independent commercial testing laboratory of its own choosing to ascertain whether it was in compliance with contract requirements, and for this purpose caused the laboratory to conduct the identical tests that plaintiff had already performed at its own plant. Plaintiff construes this action on defendant's part to constitute a reversal of defendant's original position that plaintiff, not defendant, was required to perform the test. It accordingly complains that it was required to perform extra work not called for by the contract. Defendant contends, however, that its action in submitting the Article to an independent laboratory for testing was consistent with the portion of Part II which provided that, after contractor testing, the Article was to be submitted to defendant for "engineering evaluation and approval," as well as with Paragraph 4.3.1 of the specifications providing that the Article would be "tested for design approval" by defendant.

Plaintiff further complains that, as a result of defendant's submission of the Article to its commercial testing laboratory, contract performance was delayed until approximately January 28, 1957, because it was not until then that the laboratory finally approved the Article. Plaintiff charges that this 18-month delay from August 4, 1955, the date it submitted the First Article to defendant, to January 28, 1957, the date the First Article was finally approved, constituted a breach of contract. Defendant denies this, justifying the delay on the grounds that there were repeated failures of the Article (the laboratory ultimately tested four testers before the Article was approved). Plaintiff counters that the failures were attributable only to the

---

24. Paragraphs 4.3.2, 4.3.2.1, and 4.3.2.2 further provided that the preproduction test should include (a) "environmental tests," including testing for humidity, temperature, and altitude, and (b) a "life test" covering "a period of 200 operating hours without requiring servicing." In addition, the preproduction test was to include all of the tests described in the "Inspection Test" section.

fact of unnecessary duplicate testing, resulting in unusual strains on the Article.

Plaintiff seeks recovery of $9,000 as the value of the tests it performed.[25]

As stated, after its submission of the tested First Article on August 4, 1955, plaintiff completed production of the entire contract quantity (116) of the testers. However, since the Article was not approved until some 18 months later, plaintiff had to store the 116 completed testers in its plant for such period of time. Plaintiff seeks recovery of $1,800 as damages to compensate it for such storage.[26]

On August 16, 1957, which was subsequent to the ultimate approval by defendant of the First Article and the delivery by plaintiff of all the testers, plaintiff submitted a claim to the contracting officer for an equitable adjustment based on the alleged unnecessary preproduction testing requirement imposed on it as well as the alleged unreasonable length of time defendant took to approve the First Article.[27]

By decision of September 8, 1958, the contracting officer denied the claim. Since the alleged unnecessary testing was performed by plaintiff in the summer of 1955, but claim with respect thereto was not made until August 1957, the contracting officer held it to be untimely (Article 2 of the General Provisions of the contract required claims for equitable adjustments arising out of changes in the contract to be made "within 30 days from the date of receipt by the Contractor of the notification of change"). As to any increased costs resulting from the alleged unreasonable delay caused plaintiff in the performance of the contract, the contracting officer ruled that "[r]egardless of the merits of

your claim, there is no contractual provision under which the adjustment you request can be made."

On October 2, 1958, plaintiff appealed the denial of its claim to the Armed Services Board of Contract Appeals. However, on June 29, 1960, plaintiff advised the Board that it "consider[ed] the issue involved in the subject appeal to solely involve a question of law for which your Board would have no jurisdiction" and that "[u]nder the circumstances [plaintiff] desires to withdraw the subject appeal." On July 6, 1960, the Board (by its "Recorder") advised that, in accordance with plaintiff's letter, its appeal had been withdrawn from the Board's docket.

For the reasons following, these claims as above-described cannot be allowed.

## The Test Costs Claim

■■■ It is not understood how the Paragraph 4.3.1 sentence of the specifications upon which plaintiff relies, which provides that the preproduction model "will be tested for design approval at the Procuring Agency's Laboratory by the agency," can reasonably be interpreted as relieving plaintiff of the requirement of making the preproduction test which, as shown, was specifically imposed upon plaintiff by the above-described detailed provisions of Part II of the contract Schedule, as well as by Paragraph 4.4.3 ("Contractor's Responsibility") of the specifications. The specification paragraph relied upon by plaintiff merely calls for defendant's testing the model "for design approval" at defendant's laboratory. Such "design approval" test is, however, wholly consistent with plaintiff's making the preproduction test. Indeed, as indicated, Schedule Part II specifically provided

25. Plaintiff says it spent 600 hours on the various tests (i. e., 200 hours each on the humidity, temperature, and altitude tests) and that the then prevailing laboratory fee for such testing was $15 per hour.

26. One hundred dollars a month for 18 months.

27. The claim was a general one "to recover financial losses incurred" on the contract "due to acts of Government." It was supplemented by a letter of September 24, 1957, claiming on a "total cost" basis, i. e., plaintiff's costs were $39,306.62, and its contract receipts were $17,903.20, resulting in a "total loss" of $21,403.42, which plaintiff claimed.

that, upon completion by the contractor of the First Article tests and the submission by the contractor of the certified test data, the Article should then be forwarded to defendant "for engineering evaluation and approval." Thus, the sentence upon which plaintiff's case rests simply does not say, nor can it reasonably be interpreted as meaning, what plaintiff contends. Furthermore, the contrary meaning results in a harmonious interpretation of all parts of the contract and specifications. Under familiar principles, such an interpretation is preferred to one which would result in a conflict with other contract provisions, rendering them inoperative. Hol-Gar Manufacturing Corp. v. United States, 351 F.2d 972, 979, 169 Ct.Cl. 384, 395–396 (1965).

Even assuming that, under some strained interpretation, specification Paragraph 4.3.1 could conceivably be construed as plaintiff urges, nevertheless plaintiff does not explain how all the other provisions of the contract and specifications specifically requiring it to make the preproduction test could justifiably be ignored. At the least there would be a plain inconsistency. And here the inconsistency would necessarily have to be resolved in favor of the Schedule Part II provisions requiring the contractor to make the test since the contract further explicitly provided that "to the extent of any inconsistency between the Schedule * * * and any specifications * * *, the Schedule * * * shall control."

Finally, plaintiff's testimony shows that at the time it submitted its bid it recognized the alleged conflict in the provisions.[28] That plaintiff could not have regarded the preproduction test as an inconsequential contract item is demonstrated by the fact that, although the entire contract amounted to approximately $17,500, plaintiff's testing cost

claim here asserted is in the amount of $9,000. Yet, inexplicably, it sought no clarification of what it considered to be a conflict, nor did it bring the alleged inconsistency to anyone's attention. *Cf.* Gelco Builders & Burjay Construction Corp. v. United States, 369 F.2d 992, 997, 177 Ct.Cl. 1025, 1031 (1966). However, in such a situation it is plain that plaintiff was not at liberty to rely on the one specification provision it interpreted as not requiring it to make the test, and simply to ignore all of the other Schedule and specification provisions requiring it to make the test. Where a conflict is obvious, and certainly where the contractor actually is cognizant of it, he must make appropriate inquiry. Jefferson Construction Co. of Fla. v. United States, 364 F.2d 420, 176 Ct.Cl. 1363 (1966), cert. denied, 386 U.S. 914, 87 S.Ct. 865, 17 L.Ed.2d 786 (1967); Jefferson Construction Co. v. United States, 151 Ct.Cl. 75 (1960).[29]

*The Storage Claim*

As above pointed out, Paragraph (d) of Part II of the Schedule specifically provided that "[p]ending approval of the said First Article, the remaining articles of the said item shall not be fabricated, produced, or shipped." This provision would be applicable without regard to whether plaintiff or defendant was to make the preproduction test. Even if plaintiff were to make it, and plaintiff were thus satisfied that the Article was in full compliance with all contract and specification provisions, Part II(a) of the Schedule nevertheless required, as previously mentioned, that the Article was to be forwarded to defendant "for engineering evaluation and approval." Plaintiff could not make the unilateral determination that the Article was satisfactory and then proceed to produce the full contract quantity; and this would be so whether or not it was proper for defendant, in making such

28. Record, vol. 1 at 116–17.

29. The disposition of this claim on the merits makes it unnecessary to consider defendant's further defense that plaintiff's

failure properly to exhaust the administrative remedies available to it under the "Changes" clause of the contract bars consideration of the claim by the court.

engineering evaluation, to submit the Article to the same tests that plaintiff had already conducted.

■ Accordingly, plaintiff's completion of the full number of testers called for by the contract prior to the approval of the First Article by defendant was in clear violation of the provisions of the Schedule and therefore at its own risk. Had the contract terms been observed and the testers not been produced until after the First Article was approved, there would have been no storage problem or claim with respect thereto.[30]

### CLAIM RE V-LOAN

*Sixth Cause of Action*

Pursuant to a V-loan agreement dated September 20, 1956, $190,000 was advanced to plaintiff, upon which there is a balance due of $128,846.17, plus accrued interest, and which interest is still accruing.

Plaintiff's claim with respect to this cause of action rests upon the first four causes of action. It says that defendant should not be entitled to charge plaintiff with interest on the loan following plaintiff's alleged entitlement to be paid the moneys owed to plaintiff by defendant on said four causes. See Wire Corporation v. United States, 166 F.Supp. 744, 143 Ct.Cl. 688 (1958). To the extent that defendant is found herein to be indebted to plaintiff in an amount equal to or exceeding $128,846.17, plaintiff seeks the crediting of such amount against the V-loan *nunc pro tunc*, thus stopping the running of interest after such credit dates on the amounts credited. Plaintiff further seeks recovery of any interest accrued and paid subsequent to October 1956, the date when the delay on the Modulator contracts is alleged to have commenced. To the extent a lesser sum is found to be due, plaintiff similarly seeks the crediting of such lesser sum *nunc pro tunc* with the same effect on

plaintiff's liability for interest with respect thereto.

There is no need to consider the validity of plaintiff's theory. Even assuming its soundness, this cause of action must in any event be dismissed since, as above shown, plaintiff is not entitled to any recovery with respect to the first four causes of action.

---

30. The parties are in agreement that since this claim is grounded upon defendant's delay in approving the First Article, the contract provided no administrative remedy for its disposition. The only delay cost here sought is this storage claim.