**CAVALIER CLOTHES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 95–713C.

United States Court of Federal Claims.

Sept. 24, 2001.

Marc Lamer, Kostos & Lamer, P.C., Philadelphia, Pennsylvania, for plaintiff.

Kevin McArdle, Civil Division, U.S. Department of Justice, Washington, D.C., with whom was Assistant Attorney General David W. Ogden, for defendant.

## OPINION

ALLEGRA, Judge.

This government contract case is before the court following a trial held in New York City. In 1988, plaintiff received a contract from a Defense Department agency to manufacture military dress coats for the Marine Corps. Subsequently, the government issued various modifications and proposed modifications to that contract. Plaintiff maintains that it incurred significant additional costs in complying with those modifications and is, therefore, entitled to an equitable adjustment of the contract price. After carefully reviewing the evidence received at the trial, as well as the parties' post-trial briefs, this court finds, for the reasons set forth below, that plaintiff has not proven that it is entitled to the requested adjustment.

1. DPSC is a field activity of the Defense Logistics Agency (DLA), which is a component of the Department of Defense and responsible for procuring a wide variety of items for the military and other federal agencies. DPSC is responsible for procuring and distributing, among other things, clothing and textiles.

## I. STATEMENT OF FACTS

Cavalier Clothes, Inc. (Cavalier or plaintiff) was founded, in 1973, by Marty Katz and Robert Brandle (Mr. Brandle), and initially engaged in the manufacture of men's vests. In 1979, Cavalier won a contract issued by the Defense Personnel Support Center (DPSC), now known as the Defense Supply Center Philadelphia, to produce 10,410 Marine Corps overcoats.[1] This was the first of many DPSC contracts that Cavalier won in the early 1980s, leading it eventually to become one of DPSC's largest producers, delivering in excess of 1 million military coats between 1980 and 1985. In 1984, however, Cavalier's relationship with the DPSC began to sour, when several of its low bids were rejected. The relationship reached rock bottom in 1986, when the DPSC disqualified Cavalier from receiving further contracts due to poor delivery and quality. This action precipitated Cavalier, in March of 1986, to file a petition for reorganization under Chapter 11 of the Bankruptcy Code. Following the filing of this petition, the government attempted to debar Cavalier, but the bankruptcy court stayed that action. Subsequent investigations revealed that several government officials had improperly conspired to shift Cavalier's business to other contractors. In 1988, Cavalier and DPSC entered into a settlement agreement, under which Cavalier agreed to give up any damage claims arising from the debarment, in exchange for $250,000 and the award of a contract to produce approximately 341,000 men's Army coats, 113,010 men's Marine Corps coats, and 46,000 women's Army coats. The settlement agreement was subsequently approved by the bankruptcy court.

To effectuate this settlement, on or about March 21, 1988, DPSC awarded contract no. DLA100–88–C–0534 (the Contract) to Cavalier, calling for it to produce and deliver 500,020 men's and women's military dress coats over two years.[2] The Contract sets forth a

2. More specifically, the line items established in the contract were as follows:

Line Item 1: 341,010 Men's Army Coats, Poly/Wool Serge, Army Green (AG) 344

unit price for each delivered coat, divided into two components: one for Government–Furnished Material (GFM), essentially the cloth for the coats that the government provided to Cavalier; and the other denominated Cut–Make–and–Trim (CMT). The Contract set the value of GFM, which was deducted from the unit price in order to yield the CMT component, which, in turn, represented the amount Cavalier would actually be paid for each coat produced. The CMT component was originally set at the following levels:

(1) Men's Army Coat, Poly/Wool Serge AG–344 — $61.51903
(2) Women's Army Coat, Poly/Wool Serge AG–344 — $58.75916
(3) Men's Marine Coat, Wool Serge, shade 2234 — $65.99793
(4) Men's Marine Corp Coat, Polyester/Wool Tropical, shade 2241 — $66.99769

The Contract's total value was $40,756,760, with the CMT component making up $31,184,939. Cavalier expected to realize a profit on the Contract of at least six percent of its costs, but the Contract prices were negotiated on a lump-sum basis and Cavalier did not provide the government with a breakdown of its estimated costs during negotiations. Nonetheless, the contracting officer determined that the unit prices offered by Cavalier were fair and reasonable based upon a market survey and price analysis, and, indeed, were lower than the prices Cavalier was offering for the same items in competitive acquisitions.

The Contract included a delivery schedule, specifying how many coats of each type were to be delivered each month, with deliveries to begin on September 17, 1988, and end on August 13, 1990. The DPSC was to inspect the coats in accordance with Military Standard MIL–STD–1490E, Provisions for Evalu-

Line Item 2: 46,000 Women's Army Coats, Poly/Wool Serge, AG 344
Line Item 3: 68,010 Men's Marine Corps Coats, Wool Serge, Marine Corps shade 2234
Line Item 4: 45,000 Men's Marine Corps Coats, Poly/Wool Tropical, Marine Corps shade 2241.

3. For example, pursuant to specification MIL–STD–1490E, Cavalier was required to inspect for vertical alignment of the upper and lower pock-

ating Quality of Coats, Men's Dress. Under this standard, during the end item examination, the dress coats were to be buttoned on a model form or laid out on a table and then examined, with all defects penalized and assigned a predetermined point value of 1, 2, 3, or " * " (the latter to indicate a more serious "select" defect). The inspection standard specified how many total points or select defects were permissible before a lot would be deemed unacceptable.[3] After Cavalier's inspectors passed a coat lot, it was tendered to DPSC quality assurance representatives (QARs),[4] who would then inspect the lot in accordance with these same standards.

The Contract included a warranty clause, requiring the contractor to assure that coats were "free from defects in material or workmanship and will conform with all requirements of this contract." If this clause were breached, the DPSC had the option of accepting the defective coats and adjusting the contract price, or returning the coats to the contractor "for screening and correction or replacement." The Contract also incorporated the terms of solicitation DLA100–86–R–0343, which, in turn, incorporated the "Government Delay of Work" clause that provides, in pertinent part—

A claim under this clause shall not be allowed (1) for any costs incurred more than 20 days before the Contractor shall have notified the Contracting Officer in writing of the act or failure to act involved, and (2) unless the claim, in an amount stated, is asserted in writing as soon as practicable after the termination of the delay or interruption, but not later than the day of final payment under the contract.

ets during end-item inspection. The specification provided that if the end-item inspection revealed that the front edge of the breast pocket was not in vertical alignment with the front edge of the lower flap, then a select defect should be scored.

4. QARs are assigned to a manufacturing plant where items are produced for the government. They oversee the manufacturing process and confirm that the contractor is following the procedures set forth in the contract and specifications.

48 C.F.R. § 52.212–15(b) (1985). Various standard clauses contained in the Federal Acquisition Regulation (FAR) were also integrated, by reference, into the Contract, among them the "Audit—Sealed Bidding (Apr.1985)" clause, which provides—

Records pertaining to appeals under the Disputes clause or to litigation or the settlement of claims arising under or relating to the performance of this contract shall be made available until disposition of such appeals, litigation, or claims.

48 C.F.R. § 52.214–26(b)(2) (1987).

Another key provision incorporated in the Contract was specification MIL–I–45208A, "Inspection Systems Requirements (7/24/81)," which required Cavalier to provide and maintain an inspection system that would ensure that all coats were produced in accordance with all applicable contractual requirements. Under this provision, the contractor was obliged to maintain adequate records of all inspections and tests that would "indicate the nature and number of observations made, the number and type of deficiencies found, the quantities approved and rejected and the nature of corrective action taken as appropriate." Pursuant to this specification, Cavalier prepared a document describing, in detail, its inspection system, which stated, in pertinent part:

Records shall be maintained of all tests and inspections. The nature and number of observations performed shall be indicated and as deficiencies are found, they shall be so indicated. All records will indicate corrective action taken.

The quantities of rejected items shall be indicated. Corrective action shall be taken immediately, where in-process inspections takes place, documentation will be maintained and serve as a basis for corrective action.

In order to implement any changes to these inspection procedures, Cavalier was obliged to submit a written request to the QAR and obtain his or her approval. Cavalier main-tained the various records required by the Contract and its inspection system throughout the contract's performance, storing them in binders kept at its Jamaica, New York, facility.

Once performance began, Cavalier fell behind schedule almost immediately. Pursuant to the Contract's schedule, it was required to deliver 83,280 Men's Army Coats by December 16, 1988, but, as of December 15, 1988, had delivered only approximately a third of the required amount. On December 15, 1988, the parties executed modification P00010, lowering the monthly delivery requirement for Men's Army Coats. The modification, signed by Mr. Brandle, contained an unconditional release of all claims against the government.[5]

On February 9, 1989, the contracting officer issued modification P00012, which changed the GFM to be used for all 113,010 Men's Marine Corps Coats to Poly/Wool Gabardine green shade 2212. This modification also provided that the Marine Corps coats would be manufactured pursuant to Military Specification MIL–C–29424 (MC), made various other interim changes to the specifications, and provided that any price adjustment due as a result of the change would be determined and finalized by the contracting officer. As the accompanying picture illustrates, the Men's Marine Corps Coat covered by P00012 is a tapered dress coat with two upper pockets with flaps, two lower pockets with flaps, and a belt. Military Specification MIL–C–29424 (MC) listed the operations required to assemble this coat, identifying the proper measurements for each part of the coat, as well as a "tolerance" (i.e., the amount of variation allowed) for every measurement. Modification P00012 reiterated the applicability of both Military Standard MILI–STD–1490E, "Military Standard Provisions for Evaluating Quality of Coats, Men's Dress," and MIL–I–45208A, "Inspection Systems Requirements."

---

5. This release provided:
In consideration of this delivery schedule extension, contractor hereby unconditionally releases and waives all claims against the Government by reason of delays attributable to excusable causes which have or may have occurred in this contract and for all other causes, conditions and happenings which have occurred under this contract to date.

Figure 2-22
Service "A"
(MCB)

On March 23, 1989, the contracting officer issued modification P00017, establishing an interim CMT unit price of $66.39738 for the Men's Marine Corps Coats. Bilateral modification P00013, effective May 10, 1989, revised the delivery schedule once more, requiring Cavalier to deliver 126,000 Men's Army Coats through May 1989, and 48,000 Men's Marine Corps Coats between June and August 1989. Thereafter, Cavalier agreed to deliver 46,000 Women's Army Coats during September and October 1989; 65,010 Men's Marine Corps Coats between November 1989 and February 14, 1990; and 215,000 Men's Army Coats from the end of February 1990 through contract completion. Mr. Brandle executed this modification, on behalf of Cavalier, on April 27, 1989. According to trial testimony, following the issuance of modification P00012, on February 9, 1989, Cavalier was informed that the government had an urgent need for the Marine Corps coats and that it should concentrate on delivering those coats first. Cavalier, therefore, fell behind in its delivery of the Men's Army Coats and, as of August 11, 1989, had shipped only 110, 925 Men's Army Coats. Cavalier began shipping Men's Marine Corps Coats in September of 1989.

By letter dated October 16, 1989, Cavalier submitted a claim for an equitable adjustment of $608,699.74 for alleged increased costs in producing the 113,010 Men's Marine Corps Coats required by modification P00012. In its claim, Cavalier compared the period during which it had produced Men's Army Coats (May through August 1989) to the period in which it had produced Men's Marine Corps Coats (September through October 1989) and concluded that it had experienced significant increases in costs with respect to 44 different labor operations, as well as with respect to patterns, tape and canvas. Based on these calculations, Cavalier claimed it had experienced increased labor costs of $1.9752 per coat for each of the 113,010 Marine Corps coats, to which should be added overhead, additional material costs, general and administrative (G & A) expense, and a six percent profit. By letter dated May 7, 1990, Mr. Brandle certified the claim as "accurate" and "complete." On December 13, 1989, the contracting officer issued bilateral modification P00032, converting the remaining balance of 201,500 Men's Army Coats to Men's Marine Corps Coats shade 2212. The modification set an interim CMT unit price of $66.39738 and provided that an additional price adjustment, if necessary, would be determined and finalized by the contracting officer.

Between September 6, 1989 and November 21, 1989, Cavalier delivered five lots of Men's Marine Corps Coats. On December 20, 1989, Mr. Eugene Ricks, the chief QAR stationed at Cavalier's Jamaica, New York facility, inspected and rejected Lot No. 6 of Men's Marine Corps Coats for a variety of defects.

In inspecting this lot, Mr. Ricks, apparently for the first time, inspected vertical alignment on both the right side as well as the left side of the coat. Mr. Ricks found 35 select defects in the lot, 33 more than were allowable—32 of these were for the breast pocket being out of vertical alignment with the lower pocket flap on the right side of the coat, while three were for the left front of the coat being shorter than the right front by more than $\frac{1}{4}$ inch, the permitted tolerance. Mr. Ricks also scored 143 points for three and two point defects, as compared to an acceptable total of 42; and 209 points for three, two and one point defects, as compared to an acceptable total of 81. Thirty of these two-point defects were specifically scored for misplacement of the chevron on the sleeve of the coats.

Mr. Brandle wrote the contracting officer on January 11, 1990, and, again, on January 16, 1990, contesting the rejection and arguing that Mr. Ricks had examined vertical alignment of the right side of the coat when, historically, only the left side had been examined. Mr Brandle further complained that the QARs had examined the horizontal alignment of the pocket flaps visually and with the use of a T-square.[6] He further stated that certain odd-sized coats were not fitting properly on the model forms required by specification MIL–STD–1490E because there was a great deal of suppression in the garment (*i.e.,* the waists of the coats were narrower than what typically would be commercially associated with a given chest size), and requested that the QAR be given flexibility to use model forms that best imitated the fit on a person.[7] He suggested that the defects scored by the government for the cuff not being properly centered on the sleeve of the coat could be reduced by increasing the relevant tolerance from $\frac{1}{8}$ inch to $\frac{1}{4}$ inch. Mr. Brandle also stated that Cavalier would rescreen Lot No. 6 and that, to do so, it would suspend normal operations at its Jamaica facility.

Cavalier shut down its Jamaica facility from January 16 through 28, 1990, and worked exclusively on rescreening the rejected lot. On January 24, 1990, Lot No. 6 was reinspected and accepted by the QARs. On January 26, 1990, a meeting was held between the government and Cavalier to discuss the issues raised by Mr. Brandle's letters of January 11th and 19th. At the meeting, Mr. Brandle was informed that the right side of the Marine Corps coat would be measured for vertical alignment only after it was visually determined to be out of alignment. This procedure was verified in a February 5, 1990, letter from the contracting officer to Mr. Brandle, which also stated that a modification would be issued to allow, as necessary, odd coat sizes and lengths other than regular (*i.e.,* tall or short) to be inspected on a mannequin one size smaller than called for in the specifications. Additionally, based on discussions held at the meeting, the parties agreed that a modification would be issued increasing the allowable tolerances for centering the point of the cuff on the sleeve from $\frac{1}{8}$ inch to $\frac{3}{16}$ inch. Cavalier reopened its plant on January 29, 1990. Despite these modifications, Mr. Brandle, at this time, instructed his employees to eliminate all of the operational tolerances contained in specification MIL–C–29424 (MC) and to reject any coat that

6. Following the award to Cavalier, a conference was conducted by the Administrative Contracting Officer (ACO), Mr. Liebman, of the New York office of the Defense Contract Administration Service (DCAS). According to Mr. Brandle's testimony at trial, a representative from the DLA Headquarters attended this meeting and brought with her several "T-squares," which were to be used for inspecting the alignment of pockets on all dress coats. Mr. Brandle stated that he asked the representative where that requirement was in the Contract, or its specifications, and believes that Mr. Liebman acknowledged that it was not in the specification. Mr. Brandle later testified that none of the personnel in the factory owned a T-square and Cavalier never used one. Ms. Tor-regrossa–Gonzalez, who began as QAR at Cavalier and then became the clothing and textile specialist for the Defense Administration Contract Service Management Area (DCASMA), testified that Cavalier was not required to use it, but the QARs were instructed to use the T-square.

7. Ms. Torregrossa–Gonzalez testified that the mannequins used at Cavalier's facility were made by Wolf and those used at the depot were made by Superior. Although both Wolf and Superior mannequins were acceptable for use under the specification, the horizontal and vertical alignment on the mannequin models differed.

looked even questionable.[8] Lot No. 7, consisting of 7,500 Marine Corps coats, was shipped on February 16, 1990.

By letter dated February 5, 1990, Cavalier submitted a certified claim for $363,699 for costs allegedly incurred as a result of the shutdown of its facility and the rejection of Lot No. 6. On February 27, 1990, the contracting officer and Mr. Brandle executed modification P00033, in which the government agreed to pay Cavalier $360,000 in compensation for the changes made by modification P00012 and Cavalier waived any claims arising out of the rejection and closure of its facility. Cavalier also agreed to waive "any and all additional claims against the Government arising out of the change in fabric referenced in modification P00012."

On February 28, 1990, the contracting officer issued modification P00034, which, *inter alia*, formally increased the tolerance permitted for the measurement at the point of the cuff on the sleeve and permitted the QARs to use smaller model forms for inspection than those required in the applicable specifications. The modification provided that: "There is neither a delay in delivery nor additional cost to the Government as a result of the above change." Mr. Brandle, on behalf of Cavalier, signed modification P00034. Cavalier later stipulated that by Mr. Brandle's signing this modification, plaintiff "waived and/or released any and all claims arising from this modification" and "is estopped from asserting such claims."

Cavalier purchased lining material for the Marine Corps coats from an outside vendor, with every lot of such lining tested by both the manufacturer and the government. On at least four occasions, the green shade 2208 lining that Cavalier purchased failed inspection due to irregularities in the dying, prompting the DPSC to change the lining fabric to green shade 2209. In February of 1990, the contracting officer issued modification P00035, changing the lining shade for the coat from green shade 2208 to 2209, but permitting Cavalier to use up existing stocks of 2208 before any purchases of 2209 were required.[9] Again this modification indicated that "[t]here is neither a delay in delivery nor additional costs to the Government as a result of the above changes." Mr. Brandle signed this modification and Cavalier later stipulated had waived and released the government from liability for any and all claims arising from the modification.

In March of 1990, two additional modifications, P00036 and P00037, were sent to Cavalier:

— Proposed modification P00036 involved the breast pocket flaps. The length of these pocket flaps at the sides was to conform to certain measurements provided for in specification MIL–C–29424 (MC), plus or minus a ⅛–inch tolerance. Because the lower corner of the flaps at the sides were curved, it was difficult to determine the true length by setting a ruler along the side. Proposed modification P00036 instructed that "[d]imension for length of flap at sides shall be taken ¼ inch in from outer edges on the flap, from top to bottom." Cavalier's officials never executed this proposed modification.

— Proposed modification P00037 dealt with the three measurements relating to the cuff, one at the front creased edge, one at the back arm seam, and one at the point of the cuff. While originally the length of the cuff at the front creased edge was 3¼ inches, plus or minus a tolerance of ¼ inch, proposed modification P00037 would have changed this measurement to 3⅜ inches, plus or minus a tolerance of ¼ inch. Cavalier's officials again refused to sign this proposed modification.

---

8. Although vigorously contested by plaintiff, this finding is supported by trial and deposition testimony by Mr. Brandle, a declaration signed by Mr. Brandle that was filed earlier in this case, and the trial testimony of three of his former employees. The record also demonstrates that Cavalier neither consulted with Mr. Ricks prior to eliminating tolerances, nor informed the QAR of this modification in its inspection system. There is no evidence that the government re-

quired this change and, indeed, no evidence that the government ever rejected a coat that was within the allowable tolerances.

9. In this regard, the modification provided: "Existing stock of shade 2208 may be used until exhausted. However, all new orders should be placed for shade 2209."

Despite Cavalier's refusal to sign these modifications, Mr. Ricks implemented the inspection procedures contained therein. However, after receiving proposed modification P00037, according to the testimony of Mr. Longo, Quality Control Manager at the time, Cavalier did not change the pattern for the cuff, the marker for the cuff, or its method of measuring the cuff. Moreover, according to Messrs. Longo and Ricks, the cuff measurements never caused any rejections.

After receiving modification P00035, Mr. Ricks asked the contracting officer to clarify that the contractor was not to mix two shades of lining in one coat (*i.e.*, both green shade 2208 and 2209). In fact, Specification MIL–C–29424 (MC), applicable from the outset of the Contract, already suggested that Cavalier was prohibited from using two different shades of lining material in the same coat.[10] During March 1990, the contracting officer sent Cavalier proposed modification P00038, which stated "[t]hat existing stocks of shade 2208, being used until exhausted, may not be mixed in one unit (coat) with the substitute shade 2209. Each coat produced shall contain only one and the same shade 2208 or 2209; *not both shades in one coat.*" (Emphasis in original). As with proposed modifications P00036 and P00037, Cavalier refused to endorse this modification. At trial, there was conflicting testimony regarding the impact of this modification. When Cavalier made a repair that required a new piece of lining, its employees would find a piece of lining that matched the shade of lining in the coat from ends kept under the cutting tables. Mr. Brandle testified that after bilateral modification P00035 changed the lining shade from 2208 to 2209, Cavalier ran out of left-

over pieces of 2208 and thus, when it needed to repair a coat made with 2208, it had to tear out a coat's entire lining and replace it with 2209. This testimony, however, was contradicted by Ms. Melo, Cavalier's supervisor of the small parts department (*i.e.*, the pockets, flaps, epaulets, and sleeves) during 1989, who testified that, when she needed to make a repair, she was always able to find something "very close or really about the same." Her testimony was supported by Mr. Longo, quality control foreman at Cavalier, who testified that he could always find a leftover. Likewise, Mr. Ricks, the QAR who was stationed at Cavalier's facility 40 hours a week, also failed to notice any increase in Cavalier's internal rejections and repairs.

On May 9, 1990, the contracting officer sent Cavalier proposed modification P00040. By its terms, this document did not alter any of the operational assemblies for the coat, but instead was proposed as a "measuring technique ... to clarify how the vertical alignment may be accomplished for determining the positioning of the lower pocket flap." Paragraph 1.e of the proposed modification provided that a plain straight edge, ruler, or T-square could be used to measure for vertical alignment.[11] Notwithstanding Cavalier's refusal to execute the proposed modification, the QARs used a T-square to measure for vertical alignment when a coat appeared defective upon visual inspection. Cavalier's inspectors instead used a ruler or tape measure. Both Mr. Brandle and Mr. Cavuto testified that modification P00040 effected a "devastating change" by requiring, for the first time, a measurement of vertical

---

10. Table I, section 3.a. of the specification, entitled "Shade Marking," provides that "[a]ll lining parts shall be marked, bundled or ticketed to insure uniform shade and size throughout the garment." Section 3.6.2 of the specification similarly provided that—"[t]he component parts of the coat cut from one piece of basic material and lining material ... shall be shade marked to insure a uniform shade and size throughout the garment."

11. In this regard, paragraph 1 of the proposed modification stated:

If the right or left breast pocket is not parallel to the left front edge of the coat, this parallel-

ism must be established in order to obtain vertical alignment.

If the left front edge is irregular or not parallel so that a true vertical alignment (straight) is not evident, a visual vertical alignment must be established; i.e., an upper and lower reference point that will allow a straight edge to extend from the breast pocket to the lower flap.

This method is used with a plain straight edge, ruler or the "T" square.

Paragraph (2) of the modification stated that "[t]here will be no additional cost or delay in delivering as a result of the above clarification" and paragraph (3) asserted that "[a]ll other terms and conditions remain unchanged."

alignment on the right side of the Marine Corps coat.[12]

On May 24, 1990, the QAR rejected Lot No. 13 because of right side vertical alignment defects. On June 8, 1990, Mr. Brandle wrote the contracting officer requesting an "inconsequential waiver" of those defects. He stated that the "alleged vertical alignment defects disappear when the buttons are moved approximately 1/16." Correction of the problem on three of the eight units that were judged defective took only five minutes, and, consequently the government granted Cavalier a waiver.

On October 4, 1990, Mr. Brandle, on behalf of Cavalier, submitted a claim for an equitable adjustment in the amount of $828,363 for alleged increased direct labor costs and overhead expense incurred as a result of modification P00012 for the first 113,010 coats produced. He asserted that the additional direct labor expenses Cavalier incurred were "a function of training our labor force to deal with the changes imposed by MOD P00012," noting further that "[w]hen wide spread training is necessary productivity is reduced, production backlogs occur, individual earnings are depreciated and turnover increases." The claim made no mention of any increases in Cavalier's internal rejections and repairs, or any changes in its inspection system, as a result of the disputed modifications. Mr. Brandle certified the claim in good faith as "accurate" and "complete" and "accurately reflect[ing] the contract adjustment for which Cavalier believed the Government is liable." After receiving this claim, the government asserted that it had been waived by modification P00033, in which Cavalier agreed to "waive any and all additional claims against the Government arising out of the change in fabric referenced in modification P00012." On January 9, 1991, Mr. Brandle sent a letter to the government arguing that Cavalier's October 4, 1990, claim was also based upon bilateral modification P00034 and proposed modifications P00036, P00037, and

P00040, as well as "many unilateral instructions issued to QARs on such subjects as vertical alignment of pockets, lengths of flaps, unilateral use of a T-square or the still evolving inspection criteria for horizontal alignment of flaps." Therefore, Cavalier asserted that its claim for delays and disruptions had not been waived and "cannot and should not be dismissed by a pl[a]y on words embodied in Mod P00033."

On November 6, 1990, Cavalier submitted a claim for $1,289,996 for the changes made by modification P00032, which converted 201,500 Men's Army Coats to Men's Marine Corps Coats, Poly/Wool Gabardine green shade 2212. This claim sought $538,553.80 in increased labor costs, overhead, and G & A add-ons.

On July 24, 1991, the contracting officer and Mr. Brandle executed modification A00009, which resolved all of Cavalier's claims arising out of modification P00012, effectively increasing the interim CMT unit price set by modification P00017 to $71.465 for each of the 113,010 affected units. In October, 1991, the contracting officer and Mr. Brandle executed modification A00014, pursuant to which the contract price was increased by $1,078,411.80, in full settlement of all claims arising out of modification P00032. Payment would be made to Cavalier per unit shipped. Neither modification A00009 nor modification A00014 contained any reservation of rights by either party.

Cavalier substantially completed the Contract on July 21, 1992. A final shipment of 2,201 coats was made on March 11, 1993, by which time Cavalier had delivered a total of 317,171 Marine Corps coats. To determine how much Cavalier was paid for these coats, the final CMT price must be multiplied by the number of delivered units, and. then a deduction must be made in accordance with the settlement agreement. Pursuant to bilateral modification A00009, the CMT price for the first 113,010 coats was $71.465. Pursuant to bilateral modification A00014, the

12. Other testimony stated that Cavalier began inspecting vertical alignment on both sides of the coat following rejection of Lot No. 6. Contemporaneous evidence from a January 26, 1990, meeting regarding the rejection of that lot states that

the government informed Cavalier, at the meeting, that both sides of the coat would be measured for vertical alignment if a visual inspection revealed that either side was out of alignment.

CMT price for the remaining 204,161 coats was $71.7493. The government was entitled to deduct $1.43085 per unit pursuant to paragraph C.10 of the settlement agreement. Based upon these figures, Cavalier was paid a total of $22,270,844 for the Marine Corps coats. The amount Cavalier spent to produce the Marine Corps coats can be determined from Progress Payment Request (PPR) 69–MC, an audit of PPR 69–MC conducted by the Defense Contract Audit Agency (DCAA), and PPR 70–MC. In PPR 69–MC, Cavalier stated that it incurred $20,323,777 in costs to produce the Marine Corps coats. DCAA's audit concluded that the correct overhead and G & A rates for the Marine Corps portion of the Contract were, respectively, 79.26 percent and 9.39 percent, which Cavalier concurred with. According to DCAA's audit, the total costs incurred by Cavalier as of the submission of PPR 69–MC were $19,831,126, consisting of the $20,323,777 claimed by Cavalier minus the $492,651 in DCAA-reduced costs. In PPR 70–MC, Cavalier's final PPR relating to the Marine Corps Coats, Cavalier claimed that it incurred an additional $70,877 to produce the Marine Corps Coats. Cavalier also stated that it expected to incur another $3,150 to complete the Marine Corps coats. Combining these figures with the $19,831,126 in costs Cavalier incurred via the PPR 69–MC, its total costs on the Marine Corps Coats were $19,905,154. These figures suggest that Cavalier's profit on the Marine Corps portion of the Contract was approximately 12 percent.

At the conclusion of the Contract, Cavalier had no outstanding claims against the government. However, in 1993, the government conducted an audit which revealed that Cavalier had been overpaid $439,915,91 and, by letter dated February 24, 1994, the Defense Finance and Accounting Service demanded that Cavalier repay that sum. Cavalier subsequently admitted that it was liable to the government for the overpayment. By letter dated March 22, 1994, however, Cavalier submitted a new claim in the amount of $803,294 "for unabsorbed overhead," which while not specifically referring to any of the six disputed modifications, contended that "because of the extraordinary number of changes, (sixty-five Mods), Cavalier was unable to complete performance on this contract until March 1993." Mr. Brandle certified the claim as "accurate" and "complete." On April 12, 1994, Cavalier submitted a revised claim seeking $1,610,175 in "unabsorbed overhead" to supersede its March "draft." This claim did not mention any of the modifications now in dispute, nor that Cavalier had incurred any extra direct labor or material costs or any difficulty manufacturing the coats, and was again certified as "accurate" and "complete."

On May 24, 1994, Cavalier again filed for bankruptcy, listing debts of approximately $3 million, most of which Mr. Brandle had personally guaranteed. Following this bankruptcy filing, Mr. Brandle continued to reformulate Cavalier's outstanding claim. On June 14, 1994, he submitted a letter seeking $1,246,823.05 and attributing Cavalier's alleged delay in production to modifications 34 and 35 and proposed modifications 36, 37, 38, and 40. Describing the impact of the disputed modifications, this letter and an addendum dated June 29, 1994, asserted:

> these changes were made after approximately 200,000 units had already been cut. Therefore, the Modus Operendi [sic] had to be to reject coats at the end of the production cycle. Disassembly, by, for the most part, supervisors, recut and prepare for reassembly, ... reexamine by the shop. Therefore, while Cavalier billed only 502,-000 coats, in effect, it paid its labor force to reconstruct 10,000's [sic] of coats that were effected by the changes.

On June 29, 1994, Mr. Brandle submitted an additional letter indicating that once overhead and G & A expense were included, Cavalier's claim actually was $2,453,747.76.[13]

---

13. In this letter, Mr. Brandle stated that he expected to pay his labor force no more than a "piece work" rate, *i.e.*, an established rate for each time an operation was performed. These rates were negotiated between Cavalier and its employees' union and were $17.28 per Marine Corps coat, $12.83 per men's Army coat, and $13.36 per women's Army Coat. Mr. Brandle then multiplied the number of coats produced by the "piece work" rates and concluded that Cavalier should have only spent $7,880,728.11 on direct labor, while it actually spent

A June 30, 1994, letter from Mr. Brandle to the government detailed the operations that were affected by the previously-cited modifications. A July 29, 1994, letter from Mr. Brandle to the government stated that, between February 16, 1990, and July 17, 1992, Cavalier's employee inspectors rejected 241,505 Men's Marine Corps Coats because of the disputed modifications, amounting to an average of 403 rejects per day for two and a half years.[14] Notwithstanding these claims, Cavalier admits that it has no contemporaneous records demonstrating that its inspectors rejected and reworked a single coat as a result of the disputed modifications.

In letters dated August 24 and 26, 1994, Mr. Brandle added a claim of $169,457.75 for additional lining costs. Mr. Brandle stated that Cavalier expected to use 1.54 yards of lining for each Men's Marine Corps Coat produced, plus an additional three percent in normal end losses and waste. Thus, according to Mr. Brandle, Cavalier should have used 1.59 yards of lining per coat, or a total of 504,302 total yards. However, he asserted that Cavalier actually received and consumed 565,923 yards of lining, an overrun of 61,621 yards that Mr. Brandle attributed to the six disputed modifications. According to Mr.

Brandle, the additional lining cost Cavalier $2.75 per yard, totaling $169,457.75.[15]

On September 1, 1994, Mr. Brandle submitted a revised claim in the amount of $2,638,287.25, consisting of the $2,453,747.76 sought in his June 29, 1994 letter and the alleged additional lining costs contained in his August 24 and 26, 1994 letters. As he had on various occasions in the past, Mr. Brandle certified that the claim was made in good faith and that the supporting data were "accurate" and "complete." On March 6, 1995, after discussions with DPSC failed to resolve Cavalier's claim, Mr. Brandle submitted another certified claim in the amount of $2,683,287.25, incorporating Cavalier's September 1, 1994 claim.[16]

On July 24, 1995, the contracting officer determined that Cavalier was not entitled to any of the additional costs as claimed, issuing her decision in the form of a final decision pursuant to FAR § 52.233–1. According to the contracting officer's finding of fact, the disputed modifications were "issued on behalf of Cavalier Clothes to provide assistance and clarification for the manufacture of Marine Corps Coats . . . . The modifications provided for neither delay in delivery nor additional costs to the Government." She concluded that Cavalier "had not demonstrated or sup-

$9,495,846.08, an overrun of $1,615,117.97. Mr. Brandle reduced the overrun by $368,294.92 for "off standard labor" costs, defined as "training, below minimum wage, normal repairs, etc.," incurred during contract years 1988–90. Cavalier did not provide or cite any inspections records or other documentary evidence supporting the allegations.

14. Mr. Brandle broke down the 241,505 alleged rejections as follows:

| Mods 35 & 38 | 10% | 24,150 rejects |
| Mod 36 | 10% | 24,150 rejects |
| Mod 37 | 10% | 24,150 rejects |
| Mod 40 | 70% | 169,054 rejects |

15. There was conflicting testimony at trial regarding the total amount of lining used by Cavalier during its performance of the Contract. Mr. Ricks testified that, based on test reports given by Cavalier to the QARs regarding the amount of yardage purchased, he estimated that Cavalier was utilizing approximately one yard per jacket, plus an additional 0.03 yards of lining per coat in end losses and waste. Cavalier's witnesses, however, contended that the one yard/coat figure was arbitrary and instead supported Mr. Brandle's prior estimate that Cavalier should have used

1.59 yards per coat. Cavalier, however, did not provide any contemporaneous documentary evidence in support either of this estimate or Mr. Brandle's claim that the disputed modification caused Cavalier to use additional yards of lining.

16. At the time of Cavalier's original submission, *i.e.*, September 1, 1994, the claim/dispute procedure was governed by the Federal Circuit's decision in *Reflectone, Inc. v. Kelso*, 34 F.3d 1031 (Fed.Cir.1994). Under *Reflectone*, a contractor was first required to submit its claim as a "request." After the "request" was disputed, either by government denial or passage of an unreasonably long time, the "request" could be resubmitted as a claim. Once the claim was disputed in accordance with the provisions of the Contract Disputes Act, the contractor could file suit in this court. This procedure was later abolished by the Federal Circuit's holding in *Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed.Cir.1995). Plaintiff alleges that its resubmittal dated March 6, 1995 was the "claim" portion of its September 1, 1994 "request." Defendant views these additional claims, instead, as changes to the September 1st filing, because they incorporate additional costs and rationales.

ported any additional costs resulting from the issuance of the aforementioned modifications nor have Government actions been cause for additional costs to Cavalier Clothes and recommended that *no payment* be made on the claimed costs." (emphasis in original).

On October 27, 1995, Cavalier filed suit in this court, seeking recovery of the costs listed in its September 1, 1994, claim plus profit of six percent, overhead, the alleged additional lining costs, and G & A expense, for a total of $3,246,253. Cavalier's complaint attributes these costs to bilateral modifications P00034 and P00035 and proposed modifications P00036, P00037, P00038, and P00040. At the time that Cavalier filed its complaint, its inspection records were organized in binders at Cavalier's Jamaica facility, but Cavalier allegedly disposed of these records in late 1995 or early 1996, after its Jamaica facility and the records therein were allegedly vandalized.[17] No efforts were ever made to recover any of the records.

## II. DISCUSSION

 Plaintiff seeks an equitable adjustment of the Contract price, alleging that DPSC delayed and disrupted its performance, causing it to incur significant additional costs. The Federal Circuit has found that "[t]o receive an equitable adjustment from the Government, a contractor must show three necessary elements—liability, causation, and resultant injury." *Servidone Constr. Corp. v. United States*, 931 F.2d 860, 861 (Fed.Cir.1991) (citing *Wunderlich Contracting Co. v. United States*, 173 Ct.Cl. 180, 351 F.2d 956, 968 (1965)). Burnishing these requirements, this court has stated:

A contractor may seek an equitable adjustment to compensate for increased costs of performance flowing from changes that alter the work to be performed under the contract. To prevail on its claim for equitable adjustment(s), plaintiff must demonstrate first that any increased costs arose from conditions differing materially from those indicated in the bid documents, and that such conditions were reasonably un-

foreseeable in the light of all the information available to the contractor. Plaintiff must also show that its contract costs actually increased, and that the cost increases were the direct and necessary result of the change.

*Sterling Millwrights, Inc. v. United States*, 26 Cl.Ct. 49, 72 (1992) (citations omitted). *See also American Line Builders, Inc. v. United States*, 26 Cl.Ct. 1155, 1180 (1992). As to these requirements, the burden of proof lies squarely on the figurative shoulders of the contractor. *See Doninger Metal Products, Corp. v. United States*, 50 Fed.Cl. 110, 124 (2001); *Ralph L. Jones Co., Inc. v. United States*, 33 Fed.Cl. 327, 331 (1995) (citing *Wunderlich*, 351 F.2d at 968).

Plaintiff argues that the six disputed modifications—bilateral modifications P00034 and P00035, as well as proposed modifications P00036, P00037, P00038 and P00040—required it to modify its inspection procedures, delaying significantly the completion of the Contract and dramatically increasing Cavalier's labor and overhead costs. Cavalier identifies P00040, which assertedly mandated a new technique for examining the vertical alignment of the coat's pockets, as the "prime culprit," alleging that this modification alone caused it to reject internally and repair approximately 150,000 Marine coats. Defendant, for its part, claims that the modifications and proposed modifications did not effectuate constructive changes, but instead were adopted to assist plaintiff in performing the contract either by relaxing various specifications or clarifying requirements already specified in the contract. Defendant further asserts that even if these modifications required plaintiff to modify its production or inspection procedures, they did not cause plaintiff to incur any significant additional costs. As evidence of this, defendant notes that, paradoxically, plaintiff did not raise its claims until nearly two years after the contract was completed and four years after the six disputed modifications were issued—and, coincidentally, only after Mr. Brandle faced personal liability on guarantees for over $3

17. Cavalier, as an experienced contractor, knew it was responsible to preserve relevant records and had, in fact, shipped all of its payroll rec-

ords, 25 folders and 13 binders, to its attorney's office for safe keeping.

million in debts that were being pursued in Cavalier's bankruptcy.

This welter of conflicting assertions aside, this case boils essentially down to several basic, albeit somewhat overlapping, factual inquiries. First, did the disputed modifications actually implement conditions materially different than, and not reasonably foreseeable from, those in the original contract and military specifications? Second, did these materially different conditions directly lead Cavalier to incur additional costs or were there other reasons, unrelated to the modifications, for those additional costs? Finally, if such costs were demonstrably incurred as a result of the disputed modifications, how much were those costs—that is, to what damages is plaintiff entitled? The court will consider these issues roughly *seriatim.*

### A. Did the Disputed Modifications Materially Alter the Original Contract?

■ As noted above, "[g]enerally, an equitable adjustment is justified by a change contrary to, or materially different from, the nature of the work contemplated by the parties to the contract." *Ralph L. Jones, Co., Inc.,* 33 Fed.Cl. at 334. *See also Miller Elevator Co., Inc. v. United States* 30 Fed.Cl. 662, 678. Moreover, the courts have recognized that a contract change may create costs beyond those attributable to the changes themselves, such as those for extended performance due to the change. *Doninger,* 50 Fed.Cl. at 125; *Merritt–Chapman & Scott Corp. v. United States,* 192 Ct.Cl. 848, 429 F.2d 431, 432 (1970). Plaintiff argues that the disputed modifications varied the original specifications in a way that inevitably increased its labor costs—a claim that defendant vigorously opposes. In analyzing these competing contentions, the court will group together disputed modifications that it believes are functionally related.

### (1) Modification P00034

■ Modification P00034 formally increased the tolerance permitted for the measurement at the point of the cuff on the sleeve and permitted the QARs to use different mannequins for inspection than those required in the applicable specifications. Both of these modifications were made at plaintiff's behest and relaxed the original specifications in the contract. Moreover, Mr. Brandle, on behalf of Cavalier, signed modification P00034—an act which Cavalier has stipulated "waived and/or released any and all claims arising from this modification" and "estopped [it] from asserting such claims." Thus, while this modification undoubtedly altered the original contract specifications in a material fashion, it did so only in a salutary fashion, lessening the chance that lots would be rejected without requiring plaintiff to adopt any specific modifications in its operational procedures.[18] Therefore, it is beyond cavil that this modification did not impose any additional costs upon the plaintiff. Moreover, even, assuming *arguendo,* this modification did increase marginally plaintiff's costs, it remains that Cavalier explicitly waived any equitable adjustment based upon this bilateral modification.[19] Accordingly, this modification cannot provide a basis for an equitable adjustment of the purchase price.

### (2) Modification P00035 and Proposed Modification P00038

■ Modification P00035 changed the lining shade for the coat from green shade 2208 to 2209, but permitted Cavalier to use up

---

18. The situation presented thus is distinguishable from those in which the original contract's requirements were ambiguous and, once clarified, required a contractor to incur additional costs, in order to comply. *Cf. WRB Corp. et al v. United States,* 183 Ct.Cl. 409, 479, 1968 WL 9146 (1968). Here, the affected requirements were clear and were relaxed at plaintiff's request.

19. A release associated with a bilateral modification discharges the Government from further liability based on the facts and circumstances giving rise to the claim, unless the contractor establishes: (1) mutual mistake—neither party intended that the release cover the claim; (2) continued consideration of the claim by the parties; (3) inclusion of the claim in the release by mistake or inadvertence; or (4) fraud or duress. *H.L.C. & Assoc. Constr. Co. v. United States,* 176 Ct.Cl. 285, 367 F.2d 586, 591 (1966). *See also Niko Contracting Co., Inc. v. United States,* 39 Fed.Cl. 795, 801 (1997), *aff'd without opinion,* 173 F.3d 437 (Fed.Cir.1998) (release precluded contractor from seeking equitable adjustment).

existing stocks of 2208 until exhausted. As with modification P00034, Mr. Brandle, on behalf of Cavalier, signed this modification and released the government from liability for any and all claims arising from the modifications. Subsequently, the contracting officer sent Cavalier proposed modification P00038, which stated "[t]hat existing stocks of shade 2208, being used until exhausted, may not be mixed in one unit (coat) with the substitute shade 2209. Each coat produced shall contain only one and the same shade 2208 or 2209; *not both shades in one coat.*" (Emphasis in original.) Mr. Brandle, however, refused to sign this modification; the QARs, nonetheless, implemented it in inspecting the coats.

To be sure, modification P00035 constituted a material change from the original contract specifications, albeit one not brought on by defendant's whim, but by the failure of Cavalier's lining supplier to provide fabric that met the original specifications. No real change, however, was effectuated by proposed modification P00038, which required the same color lining be used in a single coat. In the court's view, this proposed modification was reasonably foreseeable from the original contract specifications, which clearly did not envision different shades of lining being employed in the same coat. In this regard, Table I, section 3.a. of Specification MIL–C–29424, entitled "Shade Marking," provides that "[a]ll lining parts shall be marked, bundled or ticketed to insure uniform shade and size throughout the garment." Section 3.6.2 of the specification similarly provided that—"[t]he component parts of the coat cut from one piece of basic material and lining material ... shall be shade marked to insure uniform shade and size throughout the garment." These provisions clearly were intended to ensure that even within a single color of lining, there would be little, if any, variation in the same shade. From these specifications, it was reasonably foreseeable that plaintiff would not be allowed to use two entirely different colors of lining in the same coat.[20]

At all events, this court finds that neither modification P00035 nor modification P00038 adversely impacted Cavalier. The record indicates that when lining parts were cut from shade 2208 fabric, various pieces and scraps of that fabric remained which could be used when a lining cut from the same fabric needed to be repaired or replaced. Regarding the impact of modifications P00034 and P00038 on this process, the court credits the testimony of Ms. Melo, Cavalier's supervisor of the small parts department during 1989, who testified that after the lining shade was changed, she still was able to find pieces of the 2208 fabric that were "very close or really about the same" if she needed to make a repair. Her testimony was corroborated by Mr. Longo, quality control foreman at Cavalier, who testified that he also never had difficulty finding a leftover to make a repair. Likewise, Mr. Ricks, the QAR who was stationed full-time at Cavalier's facility, also failed to notice any increase in Cavalier's internal rejections and repairs as a result of the change in the shade of the lining. The testimony of these three individuals contrasts sharply with that of Mr. Brandle and Mr. Cavuto, a consultant whom Mr. Brandle hired, who both testified that after the change in lining shades from 2208 to 2209, Cavalier ran out of leftover pieces of 2208 and thus, when it needed to repair a coat made with 2208, it had to tear out a coat's entire lining and replace it with 2209. Mr. Brandle indicated that this happened with respect to approximately twenty-four thousand coats.

This court finds Messrs. Brandle's and Cavuto's testimony on this point incredible—not only because it is contradicted by several other more credible witnesses, including, in particular, Mr. Ricks (whom the court found the most credible witness at trial), but particularly because it is inconsistent with the available contemporaneous documentation of the amount of lining that Cavalier employed in making the coats. Thus, lining test rec-

---

20. While plaintiff admits that it understood that MIL–C–29424 (MC) required shade matching, it contends that it was not reasonably foreseeable that the designated shade of lining would be changed in the middle of performance. While this may be true—it misses the point, as the impact of this specification clearly was foreseeable at the time that plaintiff agreed to P00035 and, did so, releasing the government from any liability based on that modification.

ords maintained by the government on Forms 1222 demonstrate that Cavalier purchased a total of 28 lots of lining for the Contract. Adding together the yards of lining in all 28 lots, as reflected on the test records, yields a total of 284,908 yards. At trial, plaintiff attempted to prove that additional lining material, not reflected in the Forms 1222 before the court, was used for production of Marine Corps coats at its Richmond Hills plant, which did its own cutting and had its own QAR. However, plaintiff's evidence on this point not only was cryptic and unsupported by any documentary evidence,[21] but also was contradicted by the QAR's written summary of the test results for all of the lining purchased by Cavalier, which indicated that, at most, Cavalier purchased 321,677 yards.[22] As such, the court finds that the amount of lining actually proven to have been used by Cavalier is consistent with the testimony of those individuals who stated that proposed modifications P00035 and P00038 did not place any additional financial burden on Cavalier. As such, the court finds that Cavalier is not entitled to an equitable adjustment on account of these proposed modifications.

### (3) Proposed Modifications P00036, P00037 and P00040

Proposed modifications P00036, P00037 and P00040 all dealt, in sundry respects, with

particular measurements or methods of measuring to be used in inspecting a coat. Thus, proposed modification P00036, which specified the method for measuring the placement of the curved breast pockets on the coats, instructed that "[d]imension for length of flap at sides shall be taken ¼ inch in from outer edges on the flap, from top to bottom." Proposed modification P00037 dealt with the three measurements relating to the cuff, one at the front creased edge, one at the back arm seam, and one at the point of the cuff. While originally the length of the cuff at the front creased edge was 3¼ inches, plus or minus a tolerance of ¼ inch, this proposed modification changed this measurement to 3⅜ inches, plus or minus a tolerance of ¼ inch. Finally, proposed modification P00040 specified the method for checking the vertical alignment of the pockets. Paragraph 1.e of the proposed modification provided that a plain straight edge, ruler, or T-square could be used to measure for vertical alignment. Cavalier refused to execute any of these three proposed modifications, yet the defendant went ahead and implemented the modifications.

■ At first blush, the evidence seems conflicting as to whether proposed modification P00036 effectuated a material change in

21. In its post-trial brief, plaintiff claims that Mr. Joseph Masri, the DLA analyst who examined its original claim, "verified that Cavalier had records to show it received a total of 565,923 yards of lining between 1989 and 1993." The record does not support this claim. While Mr. Masri's report mentions that Cavalier received a list of all lining shipments it received from 1989 through 1993, it does not indicate whether Mr. Masri reviewed those records, and appears instead merely to assume, without finding, that plaintiff used the quoted larger amount of lining. Indeed, at trial, plaintiff's counsel indicated, during a dispute over the admission of an exhibit, that Mr. Masri had seen only a summary of the lining invoices. (Ultimately, Mr. Masri's report concludes that any excess lining used by Cavalier was the result of normal operational losses and not the disputed modifications). Other aspects of the record seem to refute plaintiff's claim that the government's figure fails to include lining used at the Richmond Heights plant. Mr. Brandle testified that the Richmond Heights plant manufactured the Marine coats only "at the very end of the contract," a period that

payroll records suggest was only about eight months of the approximately three and a half years that Cavalier worked on the Marine coats. As such, if plaintiff is to be believed, the Jamaica plant, which had, on average, about twice as many employees as the Richmond Heights plant, used 321,677 yards of lining while working almost full-time for three years on the Marine coats, while the smaller Richmond Heights plant used almost as much lining—244,264 yards—while working on the same contract only for eight months. These numbers do not add up and, again, highlight the significance of plaintiff's failure to provide any invoices or other contemporaneous documentation supporting its claims regarding lining allegedly purchased for the Richmond Heights plant.

22. Mr. Ricks testified that the difference between the figures in the QAR's test summary and the Forms 1222 (321,677 versus 284,908 yards), was attributable to the fact that the tests sometimes included the vendor's total yardage figure for lots from which Cavalier only purchased a portion.

the Contract. Table III of specification MIL–C–29424 (MC) provides that the breast pocket flaps must be a certain length at the sides (varying by coat size), plus or minus a ⅛ inch tolerance. However, the lower corner of the pocket flaps at the side is curved, making it impossible to measure accurately the length of the flap by placing a ruler directly along the side. The parties stipulated that, prior to the issuance of the modification, the QARs had measured the length of the breast pocket flaps "at the sides from the top corner down to the eye right before . . . the curve of the flap." Under the proposed modification, this same measurement was described as being made "¼ inch in from [the] outer edges of the flap, from top to bottom." Now, if, under the former standard, the inspectors actually measured the length of the flap at the edge, but did not, in making that measurement, include the curved portion at the bottom of the flap, and if, under the modification, they applied the identical measurement to the full length of the flap, from top to bottom, albeit ¼ inch in from the edge, one can readily imagine that virtually every flap manufactured prior to the modification would fail inspection thereafter. But, the record suggests that this did not happen.

Two witnesses—Ms. Gonzalez–Torregrossa, a DPSC official, and Mr. Longo, Cavalier's quality control manager at the time the modification was effectuated—testified that the length of the flaps were measured the same way both before and after the modification.[23] Their testimony leads this court to conclude the prior inspection standard was somewhat ambiguous and that proposed modification P00036 merely adopted the procedure that had previously been employed for measuring the flaps. Indeed, it is telling that plaintiff never asserted in any of its numerous written communications with the DPSC, either at the time the modification was proposed or in the immediate months thereafter, that the proposed modification had actually altered the length of the flaps and was causing Cavalier to rip out virtually every pocket manufactured prior to the modification. As such, this court concludes that plaintiff has failed to demonstrate that it is entitled to an equitable adjustment based upon proposed modification P00036.

The court reaches a somewhat different conclusion with respect to proposed modification P00037. Unlike proposed modification P00036, this modification seemingly did change the prior specifications in a material fashion. This disputed modification shifted the measurements of the cuffs, increasing the placement at the front crease by ⅛ of inch. Based on the record, this court readily surmises that this modification must have led to some cuffs that would have previously qualified being rejected, as well as the converse, *i.e.,* some cuffs that would have previously been rejected being accepted.[24] Accordingly, this court finds that proposed modification P00037, at least at first blush, potentially does provide grounds for an equitable adjust-

---

**23.** When asked about this matter at trial, Mr. Longo testified, as follows:

> Q: I would like to talk about the flap now. Did the marker for the flaps ever change?
> A: No.
> Q: Was there ever a time that you measured the flap differently?
> A: No.
> Q: It was always measured the same?
> A: Yes.

Moreover, in her testimony, Ms. Gonzalez–Torregrossa emphasized repeatedly that had the measurement of the length of the flap been taken at the edge, excluding the curved bottom, every flap would have failed inspection, stating at one point: "It was just you say, a rule of reason because if you go to the very edge of the flap at the side, like it say length of flap at sides, if you go to the sides right there, you're going to have problem. It always fail. It always fails." She,

therefore, indicated that both before and after the proposed modification, the length was measured by moving the ruler in ¼ inch from the edge.

**24.** By way of further explanation of this point, the original specifications provided that the measurement for the length of the cuff at the front creased edge was to be 3¼ inches, plus or minus a tolerance of ¼ inch, for an acceptable range of 3 inches to 3½ inches. Proposed modification P00037 changed this measurement to 3⅜ inches, plus or minus a tolerance of ¼ inch. This changed the acceptable range for the measurement to 3⅛ inches to 3⅝ inches. Accordingly, after this proposed modification, a cuff with a measurement at the front creased edge of 3 inches was no longer acceptable; conversely, after the proposed modification, a crease edge of 3⅝ inch, which would have previously been rejected, now was acceptable.

ment, subject to important qualifications described below.

The meaning and impact of proposed modification P00040 was hotly contested at trial. Defendant maintains that this proposed modification did not change the method employed by its QARs in inspecting the vertical alignment of the coats, noting that Mr. Brandle was informed that a T-square could be used for this purpose at a post-award conference. Plaintiff, however, points out that at that initial meeting, and on repeated occasions subsequent thereto, Mr. Brandle objected to the use of the T-square, asserting that it represented not only a change in the military specifications, but a dramatic change in the inspection method that Cavalier and the QARs had followed for many years. Moreover, plaintiff asserts that, prior to the issuance of P00040, the defendant constructively changed the specifications by checking vertical alignment not only on the left side of the coat, but also on the right side. Accordingly, plaintiff maintains that even if proposed modification P00040 did not itself effectuate a change, the government still unilaterally changed the method for inspecting vertical alignment without Cavalier's acquiescence.

To be sure, some evidence at trial supports plaintiff's claim that, following the award of the Contract, the method by which vertical alignment of the coats was to be checked changed. For example, there is evidence that when an issue involving vertical alignment arose in 1984 and 1985, under an earlier contract, the DPSC issued a detailed explanation describing how to measure that alignment using several measurements between the pockets on the left side of the coat and the front left edge. Notably, this diagram, and its accompanying explanatory notes, neither authorized the use of T-square to check vertical alignment, nor described how such alignment would be measured on the right side of the coat, the front edge of which, unlike the left, is curved. On the other hand, the original contract specifications seemingly required that all coat pockets—not just those on the left side—be vertically aligned. Thus, for example Table I, operation 41 of MIL–C–29424 (MC) stated:

The pocket and pocket flaps on the left and right side, respectively shall be in horizontal alignment with each other. The front edge of the upper pockets, pocket flaps, and pleats shall be in parallel alignment with front edge of coat when buttoned. The top of the breast pocket flaps shall be perpendicular to the front edge of coat when buttoned.

Accordingly, while the DPSC QARs might not have traditionally inspected vertical alignment on both the left and right sides of the coat, they clearly were entitled to do so.

Moreover, as defendant repeatedly emphasized in its post-trial briefs, the timing and content of Cavalier's various claims casts serious doubt on its assertion that proposed modification P00040, and the changes which apparently predated it, had an immediate, prolonged and severe cost impact. In assessing plaintiff's assertion, consider that: (i) the T-square was introduced right after the contract was awarded in March 1988; (ii) right side vertical alignment was checked by the QARs at least as early December 20, 1989, when Lot No. 6 was rejected; and (iii) these practices were formalized by proposed modification P00040, which was issued May 9, 1990. Yet, plaintiff did not seek any equitable adjustment with respect to these changes until January 9, 1991, and, in fact, did not ascribe thereto costs anywhere near the magnitude it now claims until at least March of 1994, nearly six years after the original changes and four years after the proposed modification. For defendant, this time lag raises doubts regarding the accuracy of plaintiff's claim; but, more important in this court's mind, is the serious question presented as to whether Cavalier complied with the notice requirements of the Contract, which required it promptly to inform the contracting officer, in writing, if an action by the government was causing it to incur significant additional costs.

Ultimately, however, this court need not resolve whether proposed modification P00040, or any unilateral change in inspection procedures that preceded it, warrants an equitable adjustment, as it concludes, for the reasons that follow, that plaintiff has failed to prove that it is entitled to any additional

damages on account of those changes. As will be seen, this defect in proof also precludes plaintiff from recovering any damages with respect to proposed modifications P00036 and P00037.

### C. Did the Disputed Modifications Lead to Increased Costs/Damages?

 Where liability exists, damage awards generally are calculated based upon the difference between the reasonable cost for performing the work, as changed, and the reasonable cost for performing the work according to the original contract specifications. *J.L. Simmons Co. v. United States*, 188 Ct. Cl. 684, 412 F.2d 1360, 1370 (Ct.Cl.1969). Not surprisingly, proof of the quantum of damages rests "solely upon plaintiff." *Mega Constr. Co., Inc. v. United States*, 29 Fed.Cl. 396, 444 (1993). Such proof must be made "with sufficient certainty so that the determination ... will be more than mere speculation." *Willems Indus., Inc. v. United States*, 155 Ct.Cl. 360, 295 F.2d 822, 831 (1961) (citing *Winn–Senter Constr. Co. v. United States*, 110 Ct.Cl. 34, 75 F.Supp. 255, 259 (1948)). *See also Northrop Grumman Corp. v. United States*, 47 Fed.Cl. 20, 29 (2000); *Skip Kirchdorfer, Inc. v. United States*, 14 Cl.Ct. 594, 605 (1988). The preferred method for proving such damages is "through the submission of actual cost data." *Delco Elec. Corp. v. United States*, 17 Cl.Ct. 302, 321 (1989) (citing *Cen–Vi–Ro of Texas, Inc. v. United States*, 210 Ct.Cl. 684, 685, 538 F.2d 348 (1976)), *aff'd*, 909 F.2d 1495 (Fed.Cir. 1990) (table). "Logically, to prove damages through the actual cost method," this court recently stated, "the plaintiff must provide the court with specific documentation of the expenses caused by the government's change." *Doninger*, 50 Fed.Cl. at 125. *See also Delco Elec.*, 17 Cl.Ct. at 321 ("In maintaining cost data, a contractor should segregate costs associated with the change where it is feasible to do so, and especially where

the contractor can anticipate submitting a large claim.").

Nonetheless, in some complex contract cases, exact computation of damages may prove extremely difficult. Thus, the Court of Claims has held that, "[t]he ascertainment of damages, or of an equitable adjustment, is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: 'It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation.'" *Electronic & Missile Facilities, Inc. v. United States*, 189 Ct.Cl. 237, 416 F.2d 1345, 1358 (1969) (citations omitted, emphasis in original). *See also Wunderlich Contracting Co.* 351 F.2d at 968 ("[i]t is sufficient if ... [the plaintiff] furnishes the court with a reasonable basis for computation, even though the result is only approximate."); *Jackson v. United States*, 12 Cl.Ct. 363, 366–67 (1987). However, "leniency as to the actual mechanics of computation does not relieve a contractor of its basic and essential burden of establishing the fundamental facts of liability, causation, and resultant damage." *G.M. Shupe, Inc. v. United States*, 5 Cl.Ct. 662, 737 (1984). *See also Doninger*, 50 Fed.Cl. at 126; *Miller Elevator*, 30 Fed.Cl. at 702.

 Consistent with these validating principles, there are two alternative methods used to determine the quantum of damages for equitable adjustments if actual costs cannot be documented: the total cost method and the jury verdict method. Under the total cost method, the contractor recovers the difference between its total costs incurred in performance of the contract and its bid price. This method of quantifying damages has been approved by the Federal Circuit, but only as a theory of last resort. *Youngdale & Sons Constr. Co. v. United States*, 27 Fed.Cl. 516, 540 (1993) (citing *Servidone*, 931 F.2d at 861).[25] Consistent with this precedent, this court has observed that

---

25. As noted by the Federal Circuit in its pathmarking opinion in *Servidone*:

> A trial court must use the total cost method with caution and as a last resort. Under this method, bidding inaccuracies can unjustifiably reduce the contractor's estimated costs. More-

over, performance inefficiencies can inflate a contractor's costs. These inaccuracies and inefficiencies can thus skew accurate computation of damages.

931 F.2d at 861–62.

"[u]se of this method is highly disfavored by the courts, because it blandly assumes—that every penny of the plaintiff's costs are prima facie reasonable, that the bid was accurately and reasonably computed, and that the plaintiff is not responsible for any increases in cost." *Youngdale*, 27 Fed.Cl. at 541.

■ Because the total cost method is disfavored, the courts, beginning with the Court of Claims in *WRB Corp. v. United States*, 183 Ct.Cl. 409, 426, 1968 WL 9146 (1968), have required four indicia of reliability to be present before a contractor may recover under this method. Thus, availability of this method hinges on whether: "(1) the nature of the particular losses make it impossible or highly impractical to determine them with a reasonable degree of accuracy; (2) the plaintiff's bid or estimate was realistic; (3) its actual costs are reasonable; and (4) it was not responsible for the added expenses." *Id.* at 426. *See also Servidone*, 931 F.2d at 861; *Boyajian v. United States*, 191 Ct.Cl. 233, 423 F.2d 1231, 1243 (1970); *Doninger*, 50 Fed.Cl. at 125–26; *Youngdale*, 27 Fed.Cl. at 541. In *Mega Construction Company*, 29 Fed.Cl. at 444, this court held that plaintiff must prove all four of these requirements by a preponderance of the evidence. *See also Teledyne McCormick–Selph v. United States*, 218 Ct.Cl. 513, 588 F.2d 808, 810 (1978); *Youngdale*, 27 Fed.Cl. at 541. Thus, if plaintiff cannot prove all of the elements, or, conversely, if the defendant can disprove at least one of them, the court will deny recovery under the total cost method. *Youngdale*, 27 Fed.Cl. at 541. Such a circumstance, however, is not necessarily fatal to a recovery of damages inasmuch as it may give rise to the court's use of an alternative, *i.e.*, the modified total cost method. *Id.* *See also Servidone*, 931 F.2d at 862.

■ The modified total cost method is used both as a means of "tempering a total cost award," *Northrop Grumman*, 47 Fed.Cl. at 92 and "prevent[ing] the government from obtaining a windfall stemming from the plaintiff's inability to satisfy all the elements of the total cost method." *Youngdale*, 27 Fed.Cl. at 541. Under this method, the raw result obtained under the total cost method is adjusted for any deficiencies in the plaintiff's

proof. *Servidone*, 931 F.2d at 861. Viewed in terms of the four *WRB Corp.* criteria outlined above, the total cost is "used 'as only a starting point' with such adjustments thereafter made in such computations as allowances for various factors as to convince the court that the ultimate, reduced, figure fairly represented the increased costs the contractor directly suffered from the particular action of defendant which was the subject of the complaint" *Servidone*, 931 F.2d at 862 (*quoting Boyajian*, 423 F.2d at 1240). Thus, if appropriate, the modified approach is used where the court finds it necessary to adjust either the original contract price or the total cost of performance, or both. John Cibinic, Jr. & Ralph C. Nash, Jr., *Administration of Government Contracts* 715 (3d ed.1995). However, the contractor must still adequately separate the additional costs for which it is responsible. *See Neal & Co., Inc. v. United States*, 36 Fed.Cl. 600, 638 (1996) (citation omitted), *aff'd*, 121 F.3d 683 (Fed.Cir.1997). *See also MacDougald Constr. Co. v. United States*, 122 Ct.Cl. 210, 1952 WL 5943 (1952) (allowing use of method with reductions for costs incurred for reasons other than the government's actions). And, to qualify for the modified total cost method, a contractor must still demonstrate that proving actual losses is either impossible or highly impracticable. *See Amertex Enterprises Ltd. v. United States*, 1995 WL 925961 at * 65 (1995), *aff'd*, 108 F.3d 1392 (Fed.Cir.1997) (table), *cert denied*, 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998); *Grumman Aerospace Corp.*, 2001 WL 146691 (A.S.B.C.A.2001). The latter conclusion, of course, proceeds logically, as this first prong of the criteria for applying the total cost method is an "either/or" proposition not suitable for adjustment to conform to deficiencies in a contractor's proof.

In the instant case, plaintiff admits that it cannot prove its damages using the direct cost method and instead relies upon the modified total cost method. Against this background, the court will now address, *seriatim,* each of the requisite four elements to the recovery of damages under the total cost method, and, as appropriate, the modified total cost method, as well.

### (1) Impracticability of Proving Actual Losses Directly

As noted, a plaintiff must prove that the nature of its losses makes it "highly impracticable to determine the amount of the *actual* losses with a reasonable degree of accuracy." *Youngdale,* 27 Fed.Cl. at 542 (citing *Servidone,* 931 F.2d at 861, emphasis in original). *See also Neal & Co.,* 36 Fed.Cl. at 640. To be sure, in the instant case, it appears impossible for plaintiff to prove the amount of its actual losses directly with reasonable accuracy—but not because of the fleeting or ephemeral nature of those losses, or any theoretical inability to capture or document their magnitude, but simply because plaintiff failed to maintain its records. The gravamen of plaintiff's claims regarding proposed modifications P00036, P00037 and P00040 is that they required Cavalier to rework hundreds of thousands of coats—coats that allegedly would have passed inspection, but for the disputed changes in measurements and inspection techniques. Yet, plaintiff abandoned and ultimately discarded the only records that detailed exactly how many coats were reworked and for what reasons. These records were originally prepared pursuant to the requirements of Specification MIL–I–45208A and Cavalier's own inspection system, but were not maintained, despite a requirement in the contract that "[r]ecords pertaining to appeals under the Disputes clause or to litigation or the settlement of claims arising under or relating to the performance of this contract shall be made available until disposition of such appeals, litigation, or claims." Although plaintiff carefully maintained its payroll records, shipping them to its attorney's office for safekeeping, it essentially discarded the repair records while its multimillion dollar claim remained pending.

Given that the total cost method is highly disfavored, this court is disinclined to allow a plaintiff to rely on that method based on a bed of its own making. Indeed, on several occasions, this court and its predecessor have refused to apply either the "total cost" or "modified total cost" methods where a contractor failed to exercise diligence in preserving its records. In *Shupe v. United States,* 5 Cl.Ct. at 676 n. 4, for example, the plaintiff asserted that it could not prove its actual damages because it had lost various records during several relocations. This court was not persuaded that plaintiff had demonstrated the high impracticability of proving its actual losses, observing that "since plaintiff knew it had claims it intended to assert when it had said records, it was obligated to safeguard its records relating to said claims. Plaintiff's lack of diligence in preserving and safeguarding these vital records does not justify use of the total cost approach in this case." *Id.* The Court of Claims reached a similar conclusion in *WRB Corp.,* 183 Ct.Cl. at 426, 1968 WL 9146, where, as in *Shupe,* the court was faced with a contractor that had failed to maintain essential cost records. Rejecting the contractor's reliance on the "total cost method," the court stated:

> A large measure of our present uncertainty is due to the plaintiff's complete failure to maintain accurate cost records during performance. The only excuse for this lack of diligence was that plaintiff did not expect to become embroiled in litigation over the Fort Hood project. That is feeble justification for taking refuge in the total cost approach.

*Id.* See also *Delco Elec. Corp. v. United States,* 17 Cl.Ct. at 327 (noting that the reason why the total cost method is viewed with a "jaundiced eye" is "rooted in the desire to encourage contractors to maintain accurate cost records").[26]

Both *Shupe* and *WRB Corp.* teach that a contractor may rely neither on the total cost method nor on the modified total cost method if it is unable to prove actual damages because of its own failure to maintain required records. Indeed, a review of these and other cases reveals that the only factors that have been held to excuse the failure to produce

---

**26.** *See also Circle, Inc.,* 1995 WL 128264 (Eng. B.C.A.1995) ("[w]here a litigant seeking to recover under a "total cost" approach has failed to maintain and offer accurate cost records, which should be prepared in accordance with a normal accounting procedures and which would help substantiate the claim, courts and boards have been generally unwilling to adopt the total cost method"); *J.D. Abrams,* 1988 WL 142858 (Eng. B.C.A.1988) (same).

reasonably accurate cost records are those beyond the control of the contractor, such as intervening weather conditions or the conduct of the defendant or some third party. See Joseph Pickard's Sons Co. v. United States, 209 Ct.Cl. 643, 532 F.2d 739, 742–44 (1976); J.D. Hedin Constr. Co. v. United States, 171 Ct.Cl. 70, 347 F.2d 235, 247 (1965); Salem Eng'g & Constr. Corp. v. United States, 2 Cl.Ct. 803, 808 (1983). Here, however, plaintiff clearly was at fault in losing its records—as culpable, if not more so, than the contractors in Shupe and WRB Corp. As was evidently true in those cases, Cavalier also knew of its obligation to maintain records documenting its costs—the Contract and Cavalier's own inspection system explicitly required them. And more so than the contractor in WRB Corp., Cavalier's representatives, particularly its president, Mr. Brandle, clearly understood the vital importance of these records as demonstrating how many coats had been rejected, for what reasons and what had been done to repair those coats. Further, unlike in Shupe, the records here were not lost inadvertently or negligently, but purposely abandoned. Accordingly, plaintiff's grip on the modified total cost method is considerably shakier than that of the contractors whose use of that method was soundly rejected in Shupe and WRB Corp.

Nonetheless, plaintiff strenuously contends that fate and circumstances conspired against it, essentially compelling its representatives to abandon its repair records. According to varying accounts, these records, due to vandalism, leaks and other hazards at the Jamaica plant, were dislodged from their binders and strewn about the floor—dirty, water-damaged, ink-stained, burned, and even defecated and urinated upon. But, while such conditions hardly portray a Kodak moment, and might have led a disinterested individual in other circumstances understandably to abandon less important records, this court refuses to believe that Mr. Brandle blithely left to rot on the factory floor the only documentary evidence that supported his company's claims—the same Mr. Brandle who painstakingly constructed and repeatedly revised those multi-million dollar claims and who stood personally to lose millions of dollars if those claims were rejected and he was forced to make good on his guarantees of Cavalier's debt. On its face, the notion that Mr. Brandle and others abandoned these records due simply to their sorry state is utterly and wholly incredible—an observation reinforced by the fact that while Messrs. Brandle and Cavuto both testified that the records were damaged, their stories neither match up nor adequately explain why no attempt was made to recover the records.[27] Indeed, based on gaps in their testimony, this court believes that these records were more than likely abandoned because they did not support plaintiff's claim.[28] But, even accepting,

---

[27]. Mr. Brandle testified about the damaged records on three occasions—once in a pre-trial deposition, and then in plaintiff's opening and rebuttal cases. In his deposition, Mr. Brandle indicated that the records were damaged by flood due to a leaky roof and vandalism. In plaintiff's case in chief, Mr. Brandle mentioned nothing about flooding, but instead indicated that the records were vandalized. Then, Mr. Cavuto testified, also not mentioning any flooding, but instead stating that the records had been burnt, that there was ink "thrown all over the place," and excrement on the records. In his rebuttal testimony, Mr. Brandle described the records as ripped and torn and first mentioned that there was a fire at the plant, but still said nothing about ink or excrement. To be sure, the inconsistencies between these accounts are subtle and perhaps would not be so suspicious were it not for the failure of both witnesses to explain why steps were not taken to secure the records before they were dam-

aged or to recover them after they were damaged.

[28]. As this court indicated in Bean Dredging Corp. v. United States, 19 Cl.Ct. 561, 581 (1990), "[i]t is well established that the failure to produce evidence which would allegedly support the assertions of that party warrants an adverse inference in the absence of an adequate explanation for its omission." See Interstate Circuit, Inc. v. United States, 306 U.S. 208, 226, 59 S.Ct. 467, 83 L.Ed. 610 (1939) ("The production of weak evidence when strong is available can lead only to the conclusion that the strong would have been adverse. Silence then becomes evidence of the most convincing character") (citation omitted); Sensonics, Inc. v. Aerosonic Corp., 81 F.3d 1566, 1572–73 (Fed.Cir.1996) (drawing strong adverse inference from defendant's purposeful failure to preserve records and noting that use of the inference deters parties from destroying relevant evidence). Here, of course, plaintiff did provide an explanation for not producing the repair rec-

albeit contrafactually, plaintiff's explanation for the demise of its records, it remains that Cavalier's representatives were reckless in failing to protect evidence vital to the proof of its alleged damages. And for that reason, this court concludes that plaintiff has not shown that proof of actual damages here was impossible or highly impracticable.[29]

Consequently, the court finds that plaintiff has utterly failed to satisfy the first prong of the four-part test governing the availability of the total cost method. This finding is crucial and dispositive, as it precludes plaintiff's reliance not only on the total cost method, but the modified total cost method, as well.[30] Nevertheless, because the court believes that other insurmountable evidentiary deficiencies lie in plaintiff's proof with respect to other prongs of the test, it shall briefly discuss each element in turn.

**(2) Reasonableness of its Original Bid/ Price**

██ According to the Federal Circuit and this court, the second element of the *WRB Corp.* test ordinarily requires that the plaintiff prove that its bid was reasonable as made. *Servidone*, 931 F.2d at 861; *Youngdale & Sons*, 27 Fed.Cl. at 542. With respect to this element, this court's decision in *Servidone* points out that the justification behind the reasonable bid requirement is that, although entitled to recovery under the total cost method, the plaintiff should not "get the benefit of its own failure to anticipate that level of difficulty that a reasonable contractor should have expected." *Servidone Constr. Corp. v. United States*, 19 Cl.Ct. 346, 384–85 (1990), *aff'd, Servidone Constr. Corp. v. United States*, 931 F.2d 860 (Fed.Cir.1991). Stated differently, a contractor should not get the benefit of increased damages merely because it submitted an unreasonably low bid, thereby increasing the difference between its bid and its actual costs solely by underbidding the project and not by incurring incremental costs caused by the defendant's actions. *Servidone*, 931 F.2d at 861–62.

In this connection, this court in *Servidone*, 19 Cl.Ct. at 385, observed that "a determination of what was a reasonable bid must be made from the bids of others." *See also Ingalls Shipbuilding Division, Litton Systems, Inc.*, 78–1 BCA (CCH) ¶ 13,038 at 63,-668–72. In the case *sub judice*, however, there were no other formal bids—plaintiff was awarded the Contract in settlement of its prior dispute with the DPSC. While, at first blush, this fact might complicate determining whether plaintiff underpriced the contract, other cases that have evaluated the reasonableness of a bid provide some indication as to the benchmarks relevant in assessing the situation here. For example, in

ords—an explanation, however, with a decidedly hollow ring.

**29.** At trial, plaintiff asserted that its repair records were made available to Ms. Masri when he conducted his review of plaintiff's claim and that he did not deem those records significant. In his testimony, however, Mr. Masri denied ever seeing plaintiff's inspection and repair records. Moreover, even if he had seen those records, it does not relieve plaintiff of its obligation to maintain those records and present them to this court as evidence in support of its claim. *See Doninger*, 50 Fed.Cl. at 139.

**30.** For similar reasons, the "jury verdict" method of ascertaining damages is also unavailing to plaintiff. The Federal Circuit made this point amply clear in *Dawco Constr., Inc. v. United States*, 930 F.2d 872, 881 (Fed.Cir.1991), *rev'd on other grounds, Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed.Cir.1995). There, in refusing to allow a contractor who had not maintained adequate records to rely on the jury verdict method, the court stated:

Nor has Dawco demonstrated any "justifiable inability to substantiate" its damages, . . ., beyond Edmunson's documented additional expenses. Clearly, Dawco was in an ideal position to detail all its costs. Or, at least, it could have, and should have, been. The issuance of a change order request should signal to the prudent contractor that it must maintain records detailing any *additional* work, just as should the encountering of differing site conditions. The Claims Court has not identified, nor has Dawco presented us with, any justification why such precision, or something sufficiently close, could not have been accomplished as to Dawco's other costs, including any additional overhead. Therefore, Dawco's inability to substantiate the existence, to any degree of certainty, of costs beyond those incurred by Edmunson, precludes resort to the "jury verdict method."

930 F.2d at 881–82 (citation omitted, emphasis in original). *See also Joseph Pickard's Sons*, 532 F.2d at 742.

*Youngdale,* 27 Fed.Cl. at 542–43, this court looked at such things as the depth and accuracy of information available to and relied upon by the bid preparer, the bid preparer's investigation or knowledge of the contract conditions, and the government's bid or expectation for the contract. Similarly, in *Hardwick Brothers Co., II v. United States,* 36 Fed.Cl. 347, 378–80 (1996), the court considered the contractor's experience with the type of project contemplated, the contractor's diligence in carrying out investigations of the contract conditions, the contractor's anticipation of adjustment to the contract provisions, and the government's expectation of contract bids.

Here, of course, plaintiff was experienced with this type of contract. But, before applying the remainder of the analysis to the facts at hand, it is important to understand how plaintiff's claim before this court is constructed. Plaintiff began with its piece work rate for the Marine Corps coats—the rate it agreed to pay its employees—which rate was $16.86 per coat, suggesting that each coat, at standard, would cost $16.86 in direct labor. Based on this standard cost, Cavalier projects that the labor cost to produce the 317,171 Marine Corps coats it delivered should have been $5,347,503. It contends, however, relying on audited cost figures, that its labor cost to produce those coats was actually $7,065,873, leading to excess labor costs of $1,718,370. From these costs, plaintiff deducts $155,200 for "off standard" labor that it expected to incur even without the disputed modifications (*e.g.,* the cost of normal repairs and reworking), leaving excess labor costs of $1,563,170 that Cavalier attributes to the delays and revisions associated with these modifications. To this figure, Cavalier added a figure for overhead, at a rate of 79.26 percent resulting in an additional $1,238,969, as well as $169,458 relating to additional lining costs. This yielded a subtotal of $2,967,597 to which Cavalier then added general administrative costs, calculated at a rate of 9.39 percent resulting in an additional $278, 656. This process resulted in a total claim figure of $3,246,253.[31]

With this background information, it is apparent that the critical focus here is not on some composite unit price, but on plaintiff's adjusted standard labor rate—the figure which obviously drives its calculation. Yet, virtually all the evidence of reasonableness on which plaintiff relies focuses not on its standard labor rate, but its overall unit price or CMT price. Thus, for example, it points out that the DPSC Settlement Memorandum, which led to the adoption of the settlement that, in turn, caused plaintiff to be awarded the contract in question, found that Cavalier's revised unit price of $82.56658 was within the adjusted price range of $73.1671 on the low end and $82.6999 on the high. But, this memorandum fails to mention, let alone analyze the reasonableness of, plaintiff's standard labor rate—indeed, the only testimony on this point clearly indicated that the DPSC never analyzed plaintiff's component costs. Nor does plaintiff point to any other evidence in the record suggesting that the government ever verified the reasonableness of its standard labor rate in adjusting subsequently the overall unit price. Indeed, plaintiff has failed to provide any independent evidence of the reasonableness of its rates, opting to eschew expert testimony, for example, in favor of self-serving testimony from Mr. Brandle and several of Cavalier's former employees. Accordingly, the record is devoid of any reliable evidence verifying the reasonableness of plaintiff's standard labor rate.

In a final thrust supported by little more than *ipse dixit,* plaintiff is left to contend that its costs were reasonable simply because the government awarded it the contract. *Per contra.* This assertion ignores the fact that the government's focus in awarding a contract is not on whether a bid price it too low, but on whether the low bidder is responsible. While the latter inquiry does require some consideration as to whether an unusually low bid price signifies a misunderstanding of the contract's requirements,[32] it does not

---

**31.** Plaintiff made an error of addition in compiling its revised claim. Proper mathematical calculation using plaintiff's figures indicates that its total claim should have been $3,250,630.

**32.** The contracting officer's responsibility determination focuses on the bidder's ability to satisfy its contractual commitments encompassed within its responsive bid. *See Essex Electro Eng'rs,*

require the government to reject the low bid of a contractor who clearly understands those requirements. Indeed, were the fact that an award has been made sufficient, in and of itself, to prove the reasonableness of the bid price, the third requirement for qualifying for the total cost methods would hardly be a requirement at all, for in every instance in which a contractor seeks to employ those methods, it has, *ab initio*, been awarded a contract. Such a result would be especially inappropriate here as there are indications on this record that plaintiff's overall price was unreasonably low, among them, that Cavalier's unit price was considerably below that at which it had been offering the same item in other procurements.

Accordingly, based on the foregoing, the court concludes that plaintiff has failed to prove that its unit price was reasonable, providing further reason why application of the modified total cost method here is inappropriate.

### (3) The Reasonableness of its Actual Costs

█ The third element of the "modified" total cost method is whether plaintiff's actual costs are reasonable. *Servidone*, 931 F.2d at 861–62; *Youngdale & Sons*, 27 Fed.Cl. at 543. "A schedule of verified costs ... is not proof of damages but only a starting point." *Boyajian*, 423 F.2d at 1239 (*quoting River Constr. Corp. v. United States*, 159 Ct.Cl. 254, 271, 1962 WL 9302 (1962)). "Plaintiff must progress to proving that the actual costs were reasonable in light of the government-directed changes about which plaintiff complains." *Northrop Grumman Corp.*, 47 Fed.Cl. at 93. This court has also cautioned that "[plaintiff's costs] appear[ing] on plaintiff's damage schedule does not by itself amount to probative evidence in the absence of anything else...." *Boyajian*, 423 F.2d at 1239 (*quoting Roberts v. United States*, 174 Ct.Cl. 940, 357 F.2d 938, 944–45 (1966)). *See also Concrete Placing v. United States*, 25

Cl.Ct. 369, 378 n. 9 (1992) ("[j]ust because plaintiff has submitted an actual cost figure ... does not necessarily compel the conclusion that this figure is the most accurate reflection of the damages plaintiff incurred."), *aff'd*, 985 F.2d 585 (Fed.Cir.1992) (table).

Plaintiff has not remotely carried its burden on this issue. Although plaintiff offered much evidence that its claimed costs were actually incurred, it introduced essentially no evidence that these costs were reasonable. This is not surprising as it is essentially impossible to evaluate the reasonableness of plaintiff's costs without knowing how many coats were reworked as a result of the six disputed modifications—and that figure again remains unverifiable. *See S.W. Electronics & Mfg. Corp. v. United States*, 228 Ct.Cl. 333, 655 F.2d 1078, 1087 (1981) ("It is difficult to analyze the reasonableness of the costs which plaintiff claims were actually incurred without knowing the number of units reworked."). In such circumstances, plaintiff has not shown that its additional costs, though actually incurred, were not in the nature of "mere[ ] overruns that any contractor with a fixed price contract would be required to absorb." *Northrop Grumman Corp.*, 47 Fed.Cl. at 93. Rather, as the Court of Claims noted in a related setting, "[p]laintiff has contended itself with broad generalities when specificity is essential." *Commerce Int'l Co., Inc. v. United States*, 167 Ct.Cl. 529, 338 F.2d 81, 89 (1964). And, on the facts here, another distinct possibility exists—that a significant portion of these additional costs relate not to the disputed modifications, but to Mr. Brandle's unilateral decision to instruct his employees to eliminate tolerances. Indeed, Cavalier has provided this court with little more than a schedule of its costs—but the case law verifies that this does not provide a reliable point of departure for calculating its damages under either the total cost or modified total cost method. *See Boyajian*, 423 F.2d at 1239; *Neal & Co.*, 36 Fed.Cl. at 642.[33]

*Inc. v. United States*, 3 Cl.Ct. 277, 283 (1983). To be responsible, a contractor must, *inter alia*, have adequate financial resources; a satisfactory record of performance, integrity, and business ethics; and the necessary organization, skills,

and production facilities. 48 C.F.R. § 9.104–1 (1998). *See Ryan Co. v. United States*, 43 Fed.Cl. 646, 651 (1999).

**33.** By comparison, in this court's decision in *Servidone*, the plaintiff was allowed to recover

**(4) Lack of Responsibility for the Additional Costs**

 The final element of the test set out in *Servidone* is whether the contractor was responsible for the additional expense. This prong derives from the general rule that "[w]here both parties contribute to the delay neither can recover damage[s], unless there is in the proof a clear apportionment of the delay and expense attributable to each party." *William F. Klingensmith*, 731 F.2d 805, 809 (Fed.Cir.1984) (quoting *Blinderman Construction Co. v. United States*, 695 F.2d 552, 559 (Fed.Cir.1982) quoting *Coath & Goss, Inc. v. United States*, 101 Ct.Cl. 702, 714–715, 1944 WL 3694 (1944)). This is true because it is well established "that the government is relieved of liability irrespective of its faulty specifications, where the actual delays were occasioned by factors outside the government's control." *J.D. Hedin*, 347 F.2d at 244 (citations omitted). *See also Youngdale*, 27 Fed.Cl. at 546.

After carefully reviewing the testimony and documentary evidence in this case, this court concludes that Cavalier cannot meet this fourth and final criterion for several reasons: First, and foremost, Cavalier has not demonstrated how much of its costs related to the disputed modifications, as compared to other decisions or actions it took unilaterally—principal among these, Mr. Brandle's decision to order his shop to eliminate all operational tolerances contained in specification MIL–C–2924. Cavalier's inability to distinguish between delays attributable to its own actions and those allegedly attributable to the government again hinges on Cavalier's failure to retain its inspection records, which would have shown how many coats were rejected on account of the modifications. Second, without these records, Cavalier is unable to segregate the costs potentially allowable from those either attributable to (i) prior claims that were settled, and for which waivers were executed; and (ii) modifications which this court has held provide no basis for an equitable adjustment (*e.g.*, Modification P00035 and Proposed Modification P00038, relating to the lining color). For example, Cavalier's claim clearly includes costs associated with modification P00012 and the rejection of Lot No. 6, both of which matters were previously settled. Moreover, it is not simply a matter of deducting the settlement figures from plaintiff's claim as it is impossible to quantify accurately the amount of costs actually related to these two events (as opposed to the amount for which the claims were settled).

Nor, in this court's view, does plaintiff sufficiently account for its "off standard labor costs"—defined by Cavalier as costs relating to things such as "training, below minimum wage, normal repairs, etc." In its final claim, Cavalier attempted to account for these costs, which were not the responsibility of the government, by reducing its total labor costs by approximately two percent. However, this figure seems too low—in its July 1994 claim, for example, plaintiff reduced its standard production rate by 20 percent to account for "off standard labor." And plaintiff failed to deduct any off-standard labor for 1991 and 1992, apparently on the assumption that the government was responsible for delaying the completion of the Contract past the end of 1990. However, not only did plaintiff fail to produce any concrete evidence that the government was responsible for all or even a portion of this delay, but the record, in fact, reveals that at least one reason for this delay was Cavalier's inability to retain employees due to a lack of new business—dropping from approximately 300 employees in February 1990 to 88 in November of 1991—an occurrence wholly unrelated to the disputed modifications.

Accordingly, this court finds that plaintiff has failed to demonstrate that its additional costs were solely the responsibility of the government.

**(5) Redux**

In sum, this factual *tour d'horizon* leads this court to find that plaintiff has failed to

---

under the total cost method based upon an accountant's testimony with respect to the costs claimed. *Servidone*, 19 Cl.Ct. at 384. Among other things, the court indicated that the accountant "completely reconstructed plaintiff's accounting records by going back to original documents." *Id.* Clearly, no similar evidence was introduced in the case at bar.

satisfy *any* of the four preconditions to its use of the modified total cost method. To be sure, this conclusion is driven by plaintiff's failure to maintain adequate records and its concomitant inability to show that proof by actual damages was impossible here. But, it also derives, in no small part, from other gaping holes in plaintiff's proof with respect to the latter three requirements for applying the modified method, on which counts plaintiff offered little more than the bald assurances of its former officers that the increased labor and inspection costs it incurred were the result of the disputed modifications. Plaintiff's evidence falls markedly short of what is required to support the use of the modified total cost method, particularly given the many caveats associated with that method. Indeed, to find, on this sparse record, that plaintiff qualified for this method would be to metamorphose a mode of proving damages of last resort into a monstrous evidentiary safe harbor, affordable, virtually indiscriminately, to anyone. Such a holding would not only render the Federal Circuit's admonitions on the use of this method mere shibboleths, but would also, as a practical matter, abrogate various FAR clauses, all visible in this Contract, designed to forestall exactly the scenario that occurred here—a failure to document costs; a failure to preserve necessary records; a failure to notify timely the government, in writing, that a modification is having a cost impact; and, ultimately, the belated assertion of a claim which, not surprisingly, and, perhaps inevitably, lacks adequate documentation. Even in its *most* modified form, the total cost method cannot be distended to fit such a situation, leaving this court with no choice but to reject plaintiff's claim.

## III. CONCLUSION

Stripped of its veneer, plaintiff's cases suffers from, and ultimately succumbs to, a massive failure of proof—*idem est non probari et non esse* ("what is not proved and what is not, are the same"). Specifically, on this record, the court concludes that plaintiff has failed to demonstrate: (i) that modifications P00034 and P00035, as well as proposed modifications P00036 and P00038, materially changed the specifications so as to warrant an equitable adjustment; and (ii) that plaintiff is entitled to any damages with respect to any of the disputed modifications, and, in particular, modification P00037 and proposed modification P00040 (and the actions that preceded this proposed modification). As such, the Clerk is directed to enter judgment dismissing the complaint.

**IT IS SO ORDERED.**